

**FILED**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AUG 0 7 2014

JUDGE CHARLES R. NORGLE
U.S. District Court Judge

UNITED STATES OF AMERICA      )
                                   )   No. 11 CR 699
       v.                    )
                                     )   Judge Charles R. Norgle, Sr.
YIHAO PU, also known as "Ben Pu"    )

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant YIHAO PU, and his attorneys, CAROLYN GURLAND, WILLIAM FLACHSBART, and SEAN O'BRIEN, is made pursuant to Federal Rule of Criminal Procedure 11 and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

## Charges in This Case

2.     The superseding indictment in this case charges defendant with (a) wire fraud, in violation of 18 U.S.C. § 1341 (Counts 1-9); (b) unlawful possession of trade secrets, in violation of 18 U.S.C. § 1832(a)(3) (Counts 10, 11, 13, 15, 17, 19); (c) unlawful transfer of trade secrets, in violation of 18 U.S.C. § 1832(a)(2) (Counts 12, 14, 16, 18); (d) unauthorized access of a protected computer, in violation of 18 U.S.C. 1030(a)(2)(C) (Counts 20-22); and (e) obstruction of justice, in violation of 18 U.S.C. § 1519 (Count 24).

3. Defendant has read the charges against him contained in the superseding indictment, and those charges have been fully explained to him by his attorneys.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following counts of the superseding indictment: (a) Count Ten, which charges defendant with unlawful possession of a trade secret belonging to Company A, in violation of 18 U.S.C. § 1832(a)(3); and (b) Count Twelve, which charges defendant with unlawful transmission of a trade secret belonging to Citadel, in violation of 18 U.S.C. § 1832(a)(2). In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

## Factual Basis

6. Defendant will plead guilty because he is in fact guilty of the charges contained in Counts Ten and Twelve of the superseding indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline § 1B1.3, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement.

2

a.     With respect to Count Ten of the superseding indictment:

## Company A

Company A was located in Red Bank, New Jersey. Its business included the development of high-performance technology and computer source code to support the rapid buying and selling of publicly-traded stocks (commonly referred to as "high frequency trading" or "HFT").

Company A did not make its HFT platform and source code publicly available, nor did it disclose these materials to its investors or customers. These materials constituted confidential business information of Company A and were a significant source of value to Company A.

Company A's employees were instructed and required to keep confidential source code and other information related to Company A's HFT platform. Although Company A did not require its employees to sign non-disclosure agreements, Company A's employees were not permitted to copy, transmit, remove, or otherwise use any part of Company A's HFT platform and source code for non-work related purposes. Company A monitored its employees to ensure that Company A's confidential business information was kept confidential and used only for Company A's business purposes. It was material to Company A that its employees used Company A's confidential business information in a manner consistent with Company A's policies.

### Company A's Trade Secrets

Company A used its HFT platform to trade securities on national exchanges. Company A also developed "infrastructure" software that enabled customers to execute their own HFT trades using Company A's technology. Company A licensed its HFT infrastructure software to national customers through a subsidiary.

Company A's HFT platform included automated trading strategies that identified short-term investment opportunities in the purchase and sale of United States stocks. These trading strategies were based on mathematical and statistical models of investment instruments and market activities, which were translated into algorithms. Company A incorporated these algorithms into proprietary computer source code for HFT programs that automatically executed trading orders upon the occurrence of certain events in the markets.

Company A's HFT infrastructure software included, among other things, (i) tools that assisted customers in translating their automated trading strategies into computer object code and copying the object code onto Company A's computer servers in New Jersey, and (ii) tools that assisted customers in communicating with national exchanges regarding trades and setting risk parameters for their trading.

Company A maintained the source code for its HFT trading strategies and infrastructure on Company A's servers located in New Jersey and Illinois. Company A used its HFT trading strategies and platforms to execute securities trades on international financial markets, including the New York Stock Exchange, and

4

further used its HFT trading strategies and platforms to obtain market data from a financial exchange in Chicago, Illinois.

Company A's HFT strategies and infrastructure software, and their underlying source code, were trade secrets of Company A. In order to protect these trade secrets, Company A took multiple measures to protect their disclosure to unauthorized third persons. These measures included physical security at Company A's offices, limiting and monitoring access to and within Company A's computer networks, instructions to employees regarding the confidentiality of Company A's trading strategy and infrastructure source code, monitoring of employee activity by supervisors, and preventing customers from obtaining access to Company A's source code.

### PU's Employment at Company A

From on or about July 27, 2009, through on or about March 26, 2010, PU was employed by Company A as a Quantitative Analyst. As a Quantitative Analyst, PU's primary job responsibilities included testing and analyzing HFT strategies.

### PU's Unlawful Possession of a Trade Secret Belonging to Company A

From in or about March 2010, until on or about August 27, 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, PU, with intent to convert a trade secret to the economic benefit of someone other than the owner thereof, knowingly did possess a trade secret belonging to Company A, namely File 1, which contained Company A's HFT strategy and infrastructure source code, such trade secret being related to and included in a product that was

5

produced for and placed in interstate and foreign commerce, intending and knowing that the offense would injure Company A, and knowing that the trade secret was stolen and appropriated, obtained, and converted without authorization, in violation of 18 U.S.C. § 1832(a)(3).

Specifically, on or about March 25, 2010, a day before PU resigned from Company A, PU downloaded and transferred from Company A's computer system thousands of files containing Company A's business information and copied those files onto PU's personal hard drive. Among the files PU transferred was File 1, which contained Company A's HFT strategy and infrastructure source code. PU kept File 1 on his Seagate Hard Drive, Serial Number 9XW00KFP.

File 1 was a trade secret belonging to Company A. Company A took reasonable measures under the circumstances to keep File 1 secret. The information contained in File 1 was not generally known to the public and was not readily ascertainable through proper means by the public. The information contained in File 1 derived economic value from not being generally known and readily ascertainable through proper means by the public. File 1 was related to the purchase and sale of publicly-traded stocks on financial markets in the United States by individuals located throughout the United States and abroad.

PU knew that he obtained File 1 without authorization from Company A. PU intended to convert the trade secret to the economic benefit of himself, not Company A, the owner of the trade secret. PU knew that his misappropriation of File 1 would injure Company A.

6

### PU's Unlawful Possession of File 2 from Company A

From in or about March 2010, until on or about August 27, 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, PU, with intent to convert a trade secret to the economic benefit of someone other than the owner thereof, knowingly and without authorization did possess a trade secret belonging to Company A, namely File 2, which contained Company A's source code for computer programs related to Company A's HFT strategy and infrastructure software, such trade secret being related to and included in a product that was produced for and placed in interstate and foreign commerce, intending and knowing that the offense would injure Company A, and knowing that the trade secret was appropriated, obtained, and possessed without authorization, in violation of 18 U.S.C. § 1832(a)(3).

Specifically, on or about March 25, 2010, a day before PU resigned from Company A, PU downloaded and transferred from Company A's computer system onto PU's personal hard drive File 2, which contained Company A's source code for computer programs related to Company A's HFT strategy and infrastructure software. PU kept File 2 on his Seagate Hard Drive.

File 2 was a trade secret belonging to Company A. Company A took reasonable measures under the circumstances to keep File 2 secret. The information contained in File 2 was not generally known to the public and was not readily ascertainable through proper means by the public. The information contained in File 2 derived economic value from not being generally known and readily

7

ascertainable through proper means by the public. File 2 was related to the purchase and sale of publicly-traded stocks on financial markets in the United States by individuals located throughout the United States and abroad.

PU knew that he obtained File 2 without authorization from Company A. PU intended to convert the trade secret to the economic benefit of himself, not Company A, the owner of the trade secret. PU knew that his misappropriation of File 2 would injure Company A.

b.      With respect to Count Twelve of the superseding indictment:

### Citadel, LLC

Citadel, LLC, was located in Chicago, Illinois, and was a financial firm that operated an HFT platform, which Citadel referred to as Tactical Trading.

Citadel did not make its HFT platform and source code publicly available, nor did it disclose these materials to its investors or customers. These materials constituted confidential business information of Citadel and were a significant source of value to Citadel.

Citadel's employees were instructed and required to keep confidential source code and other information related to Citadel's HFT trading platform. Citadel maintained a company employee handbook, as well as policies on using and protecting Citadel's proprietary and confidential information, which employees were required to review. Among other things, the employee handbook and policies prohibited employees from: (a) Using or releasing information about any Citadel business to others without proper authorization, whether for business or personal

8

purposes; (b) Conducting Citadel business or disclosing information related to Citadel through non-approved electronic communications systems, including email accounts held on third-party email systems not approved by Citadel; (c) Removing, copying, transmitting or forwarding any of Citadel's proprietary or confidential information from any location (or permitting anyone else to do so) either electronically or by means of removable media or otherwise, unless specifically authorized by a manager; (d) Using a pass code or otherwise encrypting or password protecting any file or online communication without prior authorization; and (e) Downloading software programs or other materials from the internet without prior authorization.

Citadel also required employees to sign a non-disclosure agreement in which Citadel employees agreed to use confidential information only as required to perform their duties for Citadel (and not for their personal benefit or for the benefit of any other individual or entity). The non-disclosure agreement defined confidential information as including information relating to Citadel's internal financial affairs; strategies; portfolio holdings; portfolio management techniques; quantitative analytics and models used to evaluate financial instruments; proprietary software (including the proprietary system architectures); and Citadel's business and investment processes. It was material to Citadel that its employees used Citadel's confidential business information in a manner consistent with Citadel's employee handbook, non-disclosure agreement, and policies.

9

### Citadel's Trade Secrets

Citadel's Tactical Trading HFT platform deployed automated electronic trading strategies to identify short-term investment opportunities in global equities, futures, and other investment instruments. Citadel's Tactical Trading business used mathematical and statistical computer models to identify and quantify relationships among investment instruments and market activities, and then translated those relationships into algorithms that were incorporated into proprietary computer source code for programs that automatically executed trading orders upon the occurrence of certain events in the markets.

The algorithms incorporated into Citadel's Tactical Trading strategies, commonly referred to by Citadel employees as "alphas," used market data from national and international exchanges and other data (also referred to as "tick data") to predict the movement of investment instruments and other relevant market activity. The output of the alpha algorithms was expressed as numerical values, which Citadel employees referred to as "alpha data" or "alpha values." Furthermore, the alpha algorithms were made up of a series of smaller computations derived from tick data, referred to as alpha "terms," the output of which was a numerical value referred to as "intermediate" or "term" alpha data.

Citadel's businesses included receiving investments from outside investors that Citadel used, along with its own money, to make trades based on the predictions generated by its alpha algorithms. Citadel did not make its alpha algorithms, their components, or the output of its algorithms or their components—

10

including source code, alpha data, and term data—publicly available, nor did Citadel disclose these materials to its investors. These materials constituted trade secrets of Citadel and were a significant source of value to Citadel. Investors from throughout the United States placed money with Citadel in part because doing so enabled them to have their funds invested through the use of Citadel's proprietary trading algorithms. Citadel used its proprietary trading algorithms to execute trades on a number of national and international financial markets, including the New York Stock Exchange.

In order to protect the value of its confidential business information, Citadel took multiple measures to protect its algorithms and their components—including source code, alpha data, and term data—from disclosure to unauthorized third persons. These measures included physical security measures at Citadel's offices; limiting and monitoring access to and within Citadel's computer networks, including the disabling of computer ports; instructions to employees regarding the handling of proprietary and confidential information; and the monitoring of employee activity.

### PU's Employment at Citadel

From in or about May 2010 through on or about August 30, 2011, PU was employed by Citadel as a Quantitative Financial Engineer. As a Quantitative Financial Engineer, PU's primary job responsibilities included working with analysts and researchers to develop and enhance certain of Citadel's HFT strategies. On or about March 25, 2010, PU signed Citadel's non-disclosure

11

agreement. On or about May 17, 2010, on or about his first day of employment at Citadel, PU signed Citadel's Employee Handbook Acknowledgement Form, in which PU acknowledged that he was responsible for reading the employee handbook, familiarizing himself with its contents, and adhering to all of the policies and procedures of Citadel. On or about June 15, 2010, and again on or about August 1, 2011, PU certified that he had received Citadel's policies and procedures and understood that he was obligated to comply with them.

### PU's Unauthorized Transfer of File 3

Between on or about August 9, 2011, and on or about August 26, 2011, at Chicago, in the Northern District of Illinois, Eastern Division, PU, with intent to convert a trade secret to the economic benefit of someone other than the owner thereof, knowingly and without authorization did copy, duplicate, download, upload, replicate, and transmit a trade secret belonging to Citadel, namely, File 3, which contained alpha data and term data, such trade secret being related to and included in a product that was produced for and placed in interstate and foreign commerce, intending and knowing that the offense would injure Citadel, in violation of 18 U.S.C. § 1832(a)(2).

Specifically, beginning on or about November 11, 2010, PU circumvented Citadel's computer security measures in order to allow him to download and transmit Citadel's trade secrets from PU's work computer to PU's personal electronic storage devices. PU, without the required authorization from Citadel, created two "virtual machines" on his Citadel work computer. Those virtual

12

machines allowed PU to access computer ports that Citadel previously disabled and further allowed PU to gain unauthorized access to Citadel's computer system. PU used his unauthorized access to the work computer's ports to connect his own personal electronic devices to the Citadel computer system. PU then encrypted one of the virtual machines, which concealed its contents. PU did not disclose to Citadel that he had manipulated its computer systems.

Between on or about August 9, 2011, and on or about August 26, 2011, PU used his virtual machines to connect personal electronic storage devices to ports on his Citadel work computer. PU then downloaded, copied, and transmitted File 3, which contained Citadel's alpha data and term data, from Citadel's computer system to PU's own personal electronic storage devices. PU kept File 3 on his Western Digital Hard Drive, Serial Number WX61E41FC897. In order to commit and facilitate his commission of the theft of File 3 from Citadel, PU also used his Lenovo X300 computer, Serial Number L3A7192, a Hitachi Hard Drive, Serial Number MH3R4VAK, and a Motorola Droid phone, Serial Number 268435458113866000.

File 3 was a trade secret belonging to Citadel. Citadel took reasonable measures under the circumstances to keep File 3 secret. The information contained in File 3 was not generally known to the public and was not readily ascertainable through proper means by the public. The information contained in File 3 derived economic value from not being generally known and readily ascertainable through proper means by the public. File 3 was related to the purchase and sale of publicly-

13

traded financial instruments on financial markets in the United States and abroad.

PU knew that he obtained File 3 without authorization from Citadel. PU intended to convert the trade secret to the economic benefit of himself, not Citadel, the owner of the trade secret. PU knew that his misappropriation of File 3 would injure Citadel.

### PU's Unlawful Possession and Transfer of Files 4, 5, 6, 7, 8, and 9 from Citadel

Between on or about August 3, 2011, and on or about August 26, 2011, in Chicago, PU downloaded and transmitted File 4, File 5, and File 6 from Citadel's computer system to PU's own personal electronic storage devices. PU kept File 4 on his Western Digital Hard Drive. PU kept File 5 and File 6 on his Hitachi Hard Drive.

On or about July 26, 2011, codefendant Sahil Uppal used a computer to transfer File 7, File 8, and File 9 to a computer accessible to PU and Uppal. Citadel had not granted PU access to File 7, File 8, and File 9. PU kept File 7, File 8, and File 9 on his Hitachi Hard Drive.

Files 4 through 9 were trade secrets belonging to Citadel. Citadel took reasonable measures under the circumstances to keep Files 4 through 9 secret. The information contained in Files 4 through 9 was not generally known to the public and was not readily ascertainable through proper means by the public. The information contained in Files 4 through 9 derived economic value from not being generally known and readily ascertainable through proper means by the public.

14

Files 4 through 9 were related to the purchase and sale of publicly-traded financial instruments on financial markets in the United States and abroad.

PU knew that he obtained Files 4 through 9 without authorization from Citadel. PU intended to convert the trade secrets to the economic benefit of himself, not Citadel, the owner of the trade secrets. PU knew that his misappropriation of Files 4 through 9 would injure Citadel.

### PU's Concealment of Computer Equipment in Contemplation of a Federal Investigation

On or about August 26, 2011, Citadel representatives confronted PU concerning the unauthorized virtual machines on his Citadel work computer. Citadel representatives instructed PU to return to Citadel, and preserve and not destroy, any of Citadel's confidential information in his possession. PU was further instructed to refrain from deleting, overwriting, altering, and modifying any documents, records, and electronic files relating or referring to Citadel.

On or about August 26, 2011, PU, acting with the belief that a federal investigation into his conduct might begin at some point in the future, with the assistance of Individual A, concealed and transferred from PU's apartment to Individual A's apartment computer equipment, including the Seagate Hard Drive, which contained File 1 and File 2, along with large amounts of PU's personal files, and the Hitachi Hard Drive, which contained File 5 and File 6, along with large amounts of PU's personal files. On or about August 27, 2011, PU went to Individual

A's residence. PU set up his computer equipment and erased data from certain of the hard drives.

On or about August 28, 2011, PU agreed to have Individual A dispose of certain computer equipment, including the Hitachi Hard Drive. Individual A took six of PU's hard drives, including the Hitachi Hard Drive, and discarded them into a sanitary canal near Wilmette Harbor, Illinois. PU also asked Individual A to hide the Seagate Hard Drive, which Individual A did.

From on or about August 26, 2011, to on or about August 28, 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, PU, together with Individual A, knowingly altered, destroyed, concealed, and covered up a record, document and tangible object, namely computer equipment that contained electronic documents and files containing proprietary and confidential information of Company A and Citadel, with the intent to impede, obstruct, and influence the investigation and proper administration of any matter within the jurisdiction of any department and agency of the United States, and in relation to and contemplation of any such matter and case, in violation of 18 U.S.C. § 1519.

## Maximum Statutory Penalties

7.     Defendant understands that the charges to which he is pleading guilty carry the following statutory penalties:

a.     Count One carries a maximum sentence of 10 years' imprisonment. Count One also carries a maximum fine of $250,000. Defendant

16

further understands that with respect to Count One the judge also may impose a term of supervised release of not more than three years.

    b.    Count Twelve carries a maximum sentence of 10 years' imprisonment. Count Twelve also carries a maximum fine of $250,000. Defendant further understands that with respect to Count Twelve, the judge also may impose a term of supervised release of not more than three years.

    c.    Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

    d.    In accord with 18 U.S.C. § 3013, defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty or restitution imposed.

    e.    Therefore, under the counts to which defendant is pleading guilty, the total maximum sentence is 20 years' imprisonment. In addition, defendant is subject to a total maximum fine of $500,000, a period of supervised release, and special assessments totaling $200, in addition to any restitution ordered by the Court.

### Sentencing Guidelines Calculations

8.    Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

9.      For purposes of calculating the Sentencing Guidelines, the parties agree on the following points, except as specified below:

a.      **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2013 Guidelines Manual.

b.      **Offense Level Calculations**.

*Count Ten and Relevant Conduct*

i.      The base offense level is six, pursuant to Guideline § 2B1.1(a)(2).

ii.      It is the government's position that at least an additional 18 levels are added, pursuant to Guideline § 2B1.1(b)(1)(J), because the government contends that the loss to Company A for purposes of the guidelines calculation was at least $2.5 million. Defendant disputes the applicability of this Guideline provision as well as the government's loss calculation.

*Count Twelve and Relevant Conduct*

iii.      The base offense level is six, pursuant to Guideline § 2B1.1(a)(2).

iv.      It is the government's position that at least an additional 22 levels are added, pursuant to Guideline § 2B1.1(b)(1)(L), because the government contends that the loss to Citadel for purposes of the guideline calculation was at

18

least $20 million. Defendant disputes the applicability of this Guideline provision and the government's loss calculation.

v.     It is the government's position that an additional two levels are added, pursuant to Guideline § 2B1.1(b)(10)(C), because defendant's offense involved sophisticated means. Defendant reserves the right to contest the applicability of this Guideline provision at sentencing.

vi.     It is the government's position that an additional two levels are added, pursuant to Guideline § 3B1.3, because defendant used a special skill in a manner that significantly facilitated the commission and concealment of the offense. Defendant reserves the right to contest the applicability of this Guideline provision at sentencing.

vii.     It is the government's position that an additional two levels are added, pursuant to Guideline § 3C1.1, because defendant willfully obstructed and impeded the administration of justice with respect to the investigation of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct. Defendant does not contest application of this adjustment.

*Grouping*

viii.     Pursuant to Guideline § 3D1.2(c) and (d), the counts of conviction are grouped together.

ix.     Pursuant to Guideline § 3D1.3(b), the combined offense level will reflect the aggregated loss associated with Counts Ten and Twelve and the relevant conduct associated with those counts.

*Acceptance of Responsibility*

x.      Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

xi.     In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.      **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts

20

now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

   e. Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

   10. Both parties expressly acknowledge that this Agreement is not governed by Federal Rule of Criminal Procedure 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not

have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Agreements Relating to Sentencing

11.    Each party is free to recommend whatever sentence it deems appropriate.

12.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

13.    Regarding restitution, defendant acknowledges that pursuant to 18 U.S.C. § 3663A, the Court must order defendant, together with any jointly liable co-defendants, to make full restitution to the victims in an amount to be determined by the Court at sentencing, which amount shall reflect credit for any funds repaid prior to sentencing.

14.    Restitution shall be due immediately, but paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that, pursuant to 18 U.S.C. § 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

15.     Defendant agrees to pay the special assessment of $200 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

16.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case, pursuant to 18 U.S.C. §§ 3572, 3613, and 3664(m).

17.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the superseding indictment, as well as the indictment and the forfeiture allegations as to defendant.

### Forfeiture

18.     The superseding indictment charges that defendant has subjected real and personal property to forfeiture, namely, a Western Digital Hard Drive, Serial Number WX61E41FC897, a Seagate Hard Drive, Serial Number 9XW00KFP, a Hitachi Hard Drive, Serial Number MH3R4VAK, a Motorola Droid phone, Serial Number 268435458113866000, and a Lenovo X300 computer, Serial Number L3A7192, because that property facilitated the commission of PU's unlawful possession of a trade secret belonging to Company A, in violation of 18 U.S.C. § 1832(a)(3), and PU's theft of a trade secret belonging to Citadel, in violation of 18 U.S.C. § 1832(a)(2). By entry of a guilty plea to Counts Ten and Twelve of the superseding indictment, defendant acknowledges that the property identified above

is subject to forfeiture, and the government agrees that it will not seek any additional forfeiture.

19.     Defendant agrees to the entry of a forfeiture judgment against the property identified above, in that this property is subject to forfeiture. Prior to sentencing, defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right of ownership he has in the above-described property and further agrees to the seizure of property so that this property may be disposed of according to law. Defendant understands that forfeiture of this property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

20.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 11 CR 699.

21.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other

24

federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

## Waiver of Rights

22.    Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.    **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.    The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.    If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.    If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the superseding

25

indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

   iv.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

   v.  At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

   vi.  At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

   vii.  At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

   viii.  With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

c.    **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

23.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

24.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

25.    Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this

27

information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of 18 U.S.C. § 1001, or as a contempt of the Court.

26. For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in 26 U.S.C. § 6103(b).

## Other Terms

27. Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

## Conclusion

28. Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

29. Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

30. Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

31.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

32.    Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: August 7, 2014

ZACHARY T. FARDON
United States Attorney

YIHAO PU
Defendant

PATRICK M. OTLEWSKI
LINDSAY JENKINS
Assistant U.S. Attorneys

CAROLYN GURLAND
WILLIAM FLACHSBART
SEAN O'BRIEN
Attorneys for Defendant