```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   UNITED STATES OF AMERICA,          )
                                        )
 4              Plaintiff,              )
                                        )
 5              vs.                     )  No. 11 CR 699-1
                                        )
 6   YIHAO PU, also known as Ben Pu,    )  Chicago, Illinois
                                        )  May 5, 2016
 7              Defendant.              )  10:30 A.M.

 8            TRANSCRIPT OF PROCEEDINGS - Resentencing
           BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
 9
     APPEARANCES:
10
     For the Government:        HON. ZACHARY FARDON
11                              219 South Dearborn Street
                                Chicago, Illinois  60604
12                              BY:  MR. PATRICK MARK OTLEWSKI

13   For the Defendant:         FLACHSBART & GREENSPOON, LLC
                                333 North Michigan Avenue
14                              27th Floor
                                Chicago, Illinois   60601
15                              BY:  MR. WILLIAM W. FLACHSBART

16                              MS. CAROLYN PELLING GURLAND
                                414 North Clay Street
17                              Hinsdale, Illinois  60521

18   ALSO PRESENT:              Ms. Kelly A. Rice

19                              Mr. Yihao Pu
                                (appearing telephonically)
20

21              PAMELA S. WARREN, CSR, RPR
                   Official Court Reporter
22              219 South Dearborn Street
                        Room 2342
23              Chicago, Illinois   60604
                     (312) 408-5100
24

25
```

1          (Proceedings had in open court.)

2          THE CLERK:  11 CR 699 United States of America versus

3     Yihao Pu, resentence.

4          MR. OTLEWSKI:  Patrick Otlewski on behalf of the

5     United States.

6          MS. RICE:  Good morning, your Honor.  Kelly Rice on

7     behalf of probation.

8          MR. FLACHSBART:  Good morning, your Honor.  William

9     Flachsbart on behalf of Ben Pu.  And the rest of -- Carolyn

10    Gurland is also appearing today.  She will be here.  She is

11    just right behind me.

12         THE COURT:  All right.  Mr. Fulbright, where do we

13    stand with the Bureau of Prisons?

14         THE CLERK:  Mr. Pu?  Hello?  Could you have Mr. Pu

15    state that he's present?

16         THE DEFENDANT:  Yes.  This is Yihao Pu.

17         THE COURT:  Ask Mr. Pu to raise his right hand to be

18    sworn by Mr. Fulbright, the clerk of the court.

19         THE CLERK:  Please raise your right hand.

20         (Defendant sworn.)

21         THE COURT:  Since the Seventh Circuit opinion,

22    counsel, have you reached any agreements or understandings with

23    respect to the ultimate sentence in this case?

24         MR. OTLEWSKI:  We haven't reached any agreement with

25    respect to the ultimate sentence, your Honor, however I think

1    we actually are at least at the same Sentencing Guideline range

2    at this point.

3              THE COURT:  Is that correct?

4              MR. FLACHSBART:  That's correct, your Honor.

5              THE COURT:  And what is that agreed Sentencing

6    Guideline range?

7              MR. OTLEWSKI:  The resulting range, your Honor, and

8    when we start, I'll be prepared to walk through how we arrived

9    at that -- is 12 to 18 months.

10             MR. FLACHSBART:  Could we just take some time and walk

11   through, your Honor, how we get there?

12             MR. OTLEWSKI:  I'll be happy to do that.

13             THE COURT:  Yes.  Also I want to recognize the

14   presence of the probation officer.

15             Your name, please?

16             MS. RICE:  Kelly rice.

17             THE COURT:  Good morning.  You may be seated if you

18   wish.

19             MS. RICE:  Thank you.

20             MR. OTLEWSKI:  Your Honor, under the defendant's

21   criminal history category he is a one.  He has zero criminal

22   history points, placing him in Criminal History 1.

23             Under Guideline 2B1.1, the base offense level is six.

24   It is the government's view that loss cannot be determined in

25   this matter under 2B1.1B1.

1    THE COURT:  You mean actual loss or intended loss?

2    MR. OTLEWSKI:  Either, your Honor.

3    THE COURT:  Proceed.

4    MR. OTLEWSKI:  And then, your Honor, if we go to the

5  enhancements that apply under 2B1.1, it was the government's

6  position that under Subsection 10 that the offense conduct

7  involves sophisticated means.  That's from the -- from the

8  defense statement that was filed.  It is our understanding that

9  there is no objection to it.  Which would result in a two-level

10  increase normally.  But since the resulting offense level is

11  less than 12, the offense level is increased to 12.

12    And then, your Honor, if we look to the Section 3

13  enhancements under the guidelines, there is an enhancement for

14  abuse of a position of trust and use of special skill, which

15  increases the offense level two more levels.

16    The defendant also receives a two-level enhancement

17  for obstruction of justice.

18    And then if you take three levels off for acceptance

19  of responsibility, that puts us, your Honor -- I'm sorry -- at

20  Level 13.  Guideline -- low end of the guideline range is 12.

21  The high end is 18 months within Zone C.

22    THE COURT:  What is your response to that assertion?

23    MR. FLACHSBART:  Your Honor, Mr. Otlewski has

24  correctly summarized the sentencing guidelines, and we agree

25  with all of them.

1    THE COURT:  Another lawyer has joined us.

2    Your name, please?

3    MS. GURLAND:  Good morning, your Honor.  Carolyn

4  Gurland on behalf of defendant Ben Pu.

5    THE COURT:  Good morning.

6    I have the Seventh Circuit opinion before me and have

7  read all 22 pages.  Ultimately we must look to the last page

8  here for some guidance.  And I'm quoting from the slip opinion.

9  It says a letter like the one submitted, coupled with invoices

10  from the firms, would be more helpful, number one.

11    And then it goes on to say, the government must

12  provide an explanation supported by evidence of how each

13  professional's time was spent investigating the data breach,

14  being certain that the evidence provides adequate indication

15  that the hours claimed are reasonable.

16    And then, third, the Court must ensure that the amount

17  claimed was in fact incurred by the investigation of Pu's

18  misconduct.

19    I will accept your agreed position that the guideline

20  range is 12 to 18 months.  And so let us now proceed to what

21  the Seventh Circuit has directed us to do.  And since the

22  matter was reset for sentencing, the government has submitted

23  various documents.

24    Is that right?

25    MR. OTLEWSKI:  That's correct, your Honor.  And, your

1    Honor --

2            THE COURT:  First let me ask, is there a remaining

3    challenge to the restitution figure earlier determined by the

4    Court?

5            MR. FLACHSBART:  Yes, your Honor.

6            THE COURT:  Was there originally?

7            MR. FLACHSBART:  Yes, your Honor.

8            THE COURT:  More or less the Seventh Circuit said?

9            MR. FLACHSBART:  Correct.

10           THE COURT:  All right.  So the government may proceed

11   with its additional evidence, for example, a letter.

12           Proceed.

13           MR. OTLEWSKI:  Yes, your Honor.  What we have

14   discussed with defense counsel, and I think it makes sense

15   under the circumstances, defense counsel raised various

16   objections to the invoices that were provided from the

17   Greenburg Traurig and FTI, the forensic computer analysis firm,

18   that was engaged by Citadel after the discovery of defendant

19   Ben Pu's theft of trade secrets.  The government has gone back

20   and obtained updated invoices both from Greenburg Traurig and

21   FTI.  And pursuant to Title 18, United States Code, Section

22   366, four -- I'm sorry -- 3664, the government and defense

23   counsel have agreed that it makes most sense for us to set a

24   hearing approximately 30 days out to solely address the issue

25   of restitution in light of this new information that the

1   government received yesterday, but proceed with sentencing

2   today and leave the question of restitution to be decided at

3   that other hearing.

4           THE COURT:  What is your response?

5           MR. FLACHSBART:  We have no objection, your Honor.  We

6   did receive -- we raised numerous objections to the invoices --

7           THE COURT:  Well, if I add up all of the numerous

8   objections you have raised, what figure do you reach?

9           MR. FLACHSBART:  There is too much redactions for us

10  to have a figure.

11          THE COURT:  Well, you can't just make an argument

12  without some form of submission.  You have no submission,

13  right?

14          MR. FLACHSBART:  No, we submitted to your Honor a

15  memorandum --

16          THE COURT:  A memorandum.  But you have no evidence as

17  such.  You have a memorandum which argues, right?

18          MR. FLACHSBART:  I don't understand your question,

19  your Honor.

20          THE COURT:  Well, you have no evidence to present to

21  the Court.

22          MR. FLACHSBART:  The evidence is contained in the

23  bills that were presented.

24          THE COURT:  Okay.  But you have none of your own

25  evidence.

```
 1              MR. FLACHSBART:  To --
 2              THE COURT:  Your challenge is to the government's
 3    evidence.
 4              MR. FLACHSBART:  Correct, your Honor.  As the Eighth
 5    Circuit --
 6              THE COURT:  But you -- but you do not have any
 7    evidence to support your view of the restitution figure.
 8              MR. FLACHSBART:  That's false, your Honor.  We have
 9    their submission.  Their submission --
10              THE COURT:  You do not have your own, right?
11              MR. FLACHSBART:  It is different evidence.
12              THE COURT:  Do you have any evidence to support your
13    position?
14              MR. FLACHSBART:  Yes, your Honor.  We have --
15              THE COURT:  May I have a copy of what you have?
16              MR. FLACHSBART:  We have their submission, which they
17    provided to your Honor.
18              THE COURT:  So your evidence is their evidence.
19              MR. FLACHSBART:  Correct.
20              THE COURT:  But you have none of your own.
21              MR. FLACHSBART:  No different evidence, no, your
22    Honor, because --
23              THE COURT:  Well, it took four questions to get to
24    that point.  You have no independent submission yourself,
25    right?
```

```
 1              MR. FLACHSBART:  Other than our memorandum, your

 2    Honor, no.

 3              THE COURT:  That's not evidence, that's a memorandum

 4    by you as a lawyer.

 5              MR. FLACHSBART:  Your Honor, the evidence --

 6              THE COURT:  Well, don't you agree?

 7              MR. FLACHSBART:  That what?  That a memorandum --

 8              THE COURT:  That a memorandum is not evidence.

 9              MR. FLACHSBART:  Absolutely I agree with --

10              THE COURT:  All right.

11              MR. FLACHSBART:  -- that point, your Honor.

12              THE COURT:  So it is clear then you have no evidence

13    as such to present to the Court.  Your challenge is to the

14    government's evidence.

15              MR. FLACHSBART:  Correct.  Our challenge is to the --

16              THE COURT:  All right.  So if the Court accepts your

17    argument, what figure do you reach?

18              MR. FLACHSBART:  On the record before the Court, your

19    Honor, zero.  They have provided no evidence of unredacted time

20    entries, no summary letter --

21              THE COURT:  That is an absurd position to take.  That

22    there is no restitution in this case?

23              MR. FLACHSBART:  No.

24              THE COURT:  That there is zero?

25              MR. FLACHSBART:  Your Honor, we do not take that
```

1    position.

2            THE COURT:  Is that what you just said?

3            MR. FLACHSBART:  On the record before --

4            THE COURT:  You just said zero, right?

5            MR. FLACHSBART:  On the record before your Honor --

6            THE COURT:  Well, look, you have got to stop fencing

7    with me.

8            MR. FLACHSBART:  Yes, your Honor.

9            THE COURT:  You earlier said restitution was zero,

10   isn't that correct?

11           MR. FLACHSBART:  I am unable on the -- on the --

12           THE COURT:  My question is did you earlier just say

13   that the restitution was zero?

14           MR. FLACHSBART:  On the record before us I did say

15   that, your Honor.

16           THE COURT:  All right.  Is that your position, zero

17   restitution?

18           MR. FLACHSBART:  Only on the record before us.  We

19   were provided new invoices --

20           THE COURT:  Well, wait a minute.

21           MR. FLACHSBART:  -- this morning.

22           THE COURT:  Is it your position today that restitution

23   is zero?

24           MR. FLACHSBART:  Yes, your Honor.

25           THE COURT:  All right.  So you want more time now,

1  right?

2          MR. FLACHSBART:  The government would like more time.

3          THE COURT:  But do you want more time?

4          MR. FLACHSBART:  I think that's reasonable, your

5  Honor, yes.

6          THE COURT:  Well, do you want more time?

7          MR. FLACHSBART:  Yes.

8          THE COURT:  How much time do you want?

9          MR. FLACHSBART:  I think the government's 30 days is -

10 -

11         THE COURT:  How much time do you want?

12         MR. FLACHSBART:  Thirty days is fine.

13         THE COURT:  All right.  We'll make it 35.  Let's see

14 where that takes us.  That would be, I think, June 7th.

15         Is that an agreeable date?

16         MR. OTLEWSKI:  That is for the government.

17         MR. FLACHSBART:  That's good for us, your Honor.

18         THE COURT:  All right.  The issue of restitution will

19 continue to June 7th.  Once again, we'll make it at 10:30.

20         MR. OTLEWSKI:  Thank you, your Honor.

21         THE COURT:  Now as to the other aspects of sentencing,

22 what sentence is the Court -- excuse me -- is the government

23 asking the Court to impose on resentencing as directed by the

24 Seventh Circuit?

25         MR. OTLEWSKI:  Your Honor, the government has

1    recommended a sentence of 18 months's incarceration.

2         THE COURT:  All right.  And what is the defendant's

3    position?

4         MR. FLACHSBART:  Your Honor, the defendant is asking

5    for time served, which is just over a year.

6         THE COURT:  All right.  The government may argue its

7    position regarding the sentence, and then we'll give defense

8    counsel an opportunity to make his case as well.

9         MR. FLACHSBART:  Thank you, your Honor.

10        MR. OTLEWSKI:  Your Honor, I won't repeat all the

11   arguments that we did last time.  I trust that the Court has

12   reviewed the record and also reviewed our submission in advance

13   of the hearing today.

14        THE COURT:  Well, your submission was presented to the

15   Court on April 25, 2016, is that right?

16        MR. OTLEWSKI:  That's correct, your Honor.

17        THE COURT:  All right.  That's the one you are

18   referring to.

19        MR. OTLEWSKI:  Yes, your Honor.

20        THE COURT:  And along with your submission, there are

21   numerous letters submitted by the defendant, which the Court

22   has read and will take into account.

23        You may proceed.

24        MR. OTLEWSKI:  Thank you, your Honor.

25        Your Honor, like I said, I won't repeat the arguments

1    that we made in our April 25th submission.  I do think there

2    are some points that are worth highlighting.

3           The first is the unique posture that we find ourselves

4    in.  It is the -- a combination of the difficulty that this

5    case presented during the original sentencing hearing, and the,

6    for lack of a better word, lack of clarity from the Seventh

7    Circuit regarding the scope of remand.

8           And I'll talk about the first issue first, which was

9    the original posture that this case came before the Court.

10   Unlike a number of trade secrets cases that have been charged

11   and prosecuted in other districts where a defendant's crime has

12   been completed and the defendant has either taken the trade

13   secrets to a competitor and tried to sell them or taken them to

14   a new employer and tried to use them for his benefit at that

15   new employer, this case found itself in a different posture.

16   The defendant was caught, for lack of a better word, with his

17   hand in the cookie jar.  Citadel figured out what the defendant

18   was doing while he was doing it and was able to interrupt his

19   scheme.

20          What we do know from what the defendant was doing, we

21   know what he did and what the defendant has pled guilty to, was

22   stealing trade secrets from Citadel, from stealing trade

23   secrets from his other employer Company A, with the intent to

24   cause them -- I'm sorry -- for the economic benefit of himself.

25          And what limited information we have on that latter

1 point, your Honor, indicates that the defendant was doing that.

2 The defendant was trading in his own account.  He had

3 essentially set up a system to stream trade secrets to his

4 interactive broker's account which he was using to trade on

5 securities in similar fashion to the way that Citadel traded

6 using its trade secrets.

7   Now the defense in its submission, and they have an

8 individual that they purport to be an expert in this field, who

9 said that the defendant was nothing more than a hoarder or

10 someone who was trying to help Citadel with the side projects

11 was Sunny Uppal.

12   Your Honor, the evidence does not support either of

13 these contentions.  While it is true that the defendant might

14 have collected a lot of data from his former employers, the

15 nature of the data that the defendant stole and hoarded was

16 valuable trade secrets, things that were proven money making

17 machines from Company A, as well as from Citadel.  If he

18 was -- that separates this defendant from someone who might

19 just collect things along the way and hold on to them for

20 extended periods of time with no other apparent interest other

21 than just to look at the records and know that he has them or

22 make them publicly available to others.  He was looking for a

23 way to make money himself.

24   And this venture between the defendant and Sahil Uppal

25 was not authorized by Citadel.  They had no knowledge of it.

1   They weren't trading using money that had been provided to them

2   by Citadel.  They were trading with Ben Pu's -- I'm sorry --

3   the defendant Ben Pu was trading with his own money in order to

4   increase his own profits.  It is simply not true to state that

5   what the defendant was trying to do was for Citadel's benefit.

6          He and Sahil Uppal were not in the same group at the

7   firm.  They were not on the same projects.  They were not

8   authorized to work together on the projects that they were

9   doing outside business hours on the defendant's own home

10  computer system.

11         Your Honor, and because the defendant's crime was

12  interrupted before it could come to completion, you know, the

13  government found itself in a difficult place at the original

14  sentencing in order to estimate the loss that the defendant

15  intended to cause to Citadel.  And it had used as a proxy for

16  that intended loss the research and development costs to

17  develop the trade secrets both for Company A and for Citadel.

18         Although the Seventh Circuit has came down with its

19  decision and has offered more clarity in that area; however,

20  reading their opinion there are several instances where it

21  wasn't exactly clear what they intended to occur at

22  resentencing, whether it would be a new hearing to establish

23  what the loss, intended loss figure was, or whether they felt

24  that there was no actual -- I'm sorry -- no intended loss that

25  could be established under the facts.

1        Under the government's view, taking a conservative

2  approach and in line with some Seventh Circuit precedent on

3  scope of remand, has submitted that there is no intended loss

4  figure that can be calculated.  Now does that mean, your Honor,

5  that this is neither a serious offense nor one that does

6  deserve serious recognition by the Court?

7        While the figures that the government offered for

8  intended loss before are not appropriate proxies for what the

9  defendant intended to cause a loss to Citadel of, they are

10  still relevant at sentencing, your Honor.  The -- and in terms

11  of establishing the value and how important these things were

12  to the victims of the defendant's offenses, Citadel spent about

13  $10 million developing -- I'm sorry -- at least $10 million

14  developing the trade secrets that the defendant stole.

15        Likewise, Company A spent more than $2 million

16  developing trade secrets.  These were incredibly important

17  pieces of technology that these firms put together and were

18  using, and they were operating in a market and an environment

19  where secrecy is the number one factor that they can control

20  and that they can use to their benefit to make money against

21  other people who are using similar sophisticated technologies

22  to trade.  The defendant invaded that sense of privacy, and the

23  government has offered to the Court a number of cases where

24  other courts have recognized similar -- in similar

25  circumstances where substantial invasions of privacy resulted

1    in substantial terms of imprisonment.

2         Now putting aside for the moment the loss that the

3    defendant intended to commit, I do think it is relevant, your

4    Honor, for the Court -- and one of the things that led the

5    government to recommend a sentence of 18 months's incarceration

6    -- was the scope of the defendant's obstruction of justice.

7    The defendant destroyed numerous pieces of evidence.  He took a

8    USB drive that had an encryption code on it and claimed to have

9    smashed it with a hammer so that no one could have access to

10   it.  He enlisted his co-defendant Sahil Uppal to help him move

11   computers, approximately six computers, out of his apartment to

12   a friend's apartment to hide them there to keep them outside of

13   Citadel's knowledge and prevent them from collecting those.

14        And then when the defendant realized that Citadel was

15   closing in, he had that friend take a number of those hard

16   drives and dispose of them.  That friend ultimately disposed of

17   them in a sanitary canal.  The defendant however was very --

18        THE COURT:  Is that conduct consistent with being a

19   collector?

20        MR. OTLEWSKI:  It would appear not.  Only with respect

21   to the fact that the defendant did decide to keep one of his

22   hard drives, and that one hard drive that he told his friend to

23   keep still had trade secrets that belonged to Company A, the

24   first victim of the defendant's theft of trade secrets.

25        What the defendant did, your Honor, was serious, and

1    sent Citadel on a mission.  They had now then encountered --

2    they had now encountered an employee they could no longer

3    trust.  Someone that they had trusted with very valuable trade

4    secrets during the course of his employment, and an employee

5    who, as the government set out in its government -- in its

6    version of the offense, lied to Citadel when confronted about

7    this.  He had the opportunity to come to his employer, tell

8    them, yes, I took these things.  Yes, perhaps I took them for

9    my own economic benefit.  Instead he lied, said he didn't have

10   anything.

11          Well, Citadel to its credit didn't believe the

12   defendant and continued investigating.  And that, your Honor,

13   sent them to hire an outside law firm to handle the

14   investigation.  That caused them to hire forensic computer

15   analysts to spend a significant amount of time going through

16   both its data, the data that the defendant did turn over to

17   Citadel, as well as to collect other electronic data that the

18   defendant's friend ultimately disposed of in that sanitary

19   canal.  This was a victim doing everything it could to try to

20   locate the trade secrets and to determine the scope of the

21   trade secrets and theft that had occurred at its firm.  The

22   defendant didn't help them in any regard during that process.

23          And, your Honor, on this point, there is one thing

24   that's important.  When the FBI went and searched the

25   defendant's apartment while after -- approximately a month

1    after -- a little over a month -- I'm sorry -- after he had

2    been confronted by Citadel and after Citadel had ostensibly

3    completed its internal investigation, the FBI went to the

4    apartment, searched the apartment, and what did they find?

5    They still found proprietary confidential business information

6    related to Citadel in the defendant's apartment.  Why is that?

7    Because it tells the Court, it tells us, that the defendant was

8    still holding onto things that he thought he could make a

9    benefit of to himself from Citadel.

10           And now --

11           THE COURT:  Are you saying he expected to gain from

12    taking this intellectual property?

13           MR. OTLEWSKI:  I believe he did intend to gain from

14    it, your Honor.  And I think that's what the evidence supports.

15    And it also reflects on what the victim was faced with.  The

16    victim of this offense, one of the victims, Citadel, will never

17    know exactly what the defendant stole, will never have the

18    peace of mind that its trade secret isn't sitting in some other

19    repository from the defendant.  Every step of the way that they

20    tried to investigate that, the defendant impeded them.  And it

21    wasn't even until -- it was only when the FBI searched the

22    defendant's apartment with a warrant that they collected even

23    more evidence that the defendant hadn't turned over to Citadel

24    when approached numerous times during the investigation.  And

25    that's an important factor, I believe, for the Court to

1    consider in fashioning its sentence.

2              Now to the defendant's credit, while he has been in

3    custody, it appears that he has taken the steps towards

4    rehabilitation, your Honor.  I do think it is important to

5    note, however, for the record, the individuals from whom the

6    defendant has sought letters of recommendation.  And I received

7    these yesterday, so I wasn't able to research all of these

8    individuals, your Honor, but I'll take a moment and explain a

9    few of them.

10             One of these individuals --

11             THE COURT:  Well, let's make this point clear.  The

12   Court can't take into account post-judgment conduct.

13             MR. OTLEWSKI:  That is correct under Peppers, your

14   Honor.

15             THE COURT:  Yes.  Proceed.

16             MR. OTLEWSKI:  And, your Honor, for instance, the

17   defendant had a letter sent to the Court from Michael G. Grimm,

18   who indicated that he was a member of Congress for

19   approximately four years, that he was in the U.S. Marine Corps,

20   and he was a former special agent of the FBI.  However, what he

21   didn't indicate, your Honor, was that he is a convicted felon.

22   He committed tax fraud.  And he acknowledged committing

23   perjury, hiring illegal immigrants, and committing wire fraud.

24             Another individual named Spyros Panos, a doctor, wrote

25   a letter.  However, he failed to inform the Court that he been

1    convicted of healthcare fraud for faking surgeries over a five-

2    year period.

3           Other individuals, your Honor, including --

4           THE COURT:  With respect to those two individuals, are

5    they or were they incarcerated when they wrote the letters?

6           MR. OTLEWSKI:  They were, your Honor.

7           As well as Alexander Philipone (phonetic), another FCI

8    inmate, who is convicted of conspiring to distribute methylone.

9    Another individual Mather Waden (phonetic), who is also at the

10   FC -- Federal Correctional Institute, who had been committed --

11   convicted -- I'm sorry -- of food stamp fraud totaling

12   approximately $2 million.  Christopher Pamovile (phonetic),

13   convicted of drug smuggling.  Kevin Bordman (phonetic), a pilot

14   who stole approximately $2.7 million.  And the list goes on and

15   on.

16          THE COURT:  There is also a letter from the mother of

17   the defendant.

18          MR. OTLEWSKI:  There is, your Honor.  And it is

19   absolutely true, your Honor, that this defendant has a mother

20   who loves him very much, and that family has endured extreme

21   hardship with the loss of their son who is incarcerated.

22          From the facts though, your Honor, that mother's

23   circumstance does not seem exceptional or outside what other

24   defendants who are in similar situations would face.

25          And what this does tell the Court is that this

1    defendant has caused much of the problem he is facing.  It was

2    the defendant's choices, your Honor, who put him in this

3    situation.  It was defendant's own decisions and theft that put

4    him in prison and is causing this hardship.  There is no doubt

5    that his mother is suffering and would like her son back;

6    however, he has committed a very serious crime on two occasions

7    against both of his employers stealing very valuable trade

8    secrets.

9              THE COURT:  As the Court reviews these letters, the

10   Court is well aware of the Vrydolyak, United States Vrydolyak,

11   and the recent Seventh Circuit opinion dealing with letters

12   considered by the sentencing judge in that case.  So the Court

13   must exercise discretion and give appropriate weight to the

14   letters.  And I want to underscore that I indeed have read the

15   Vrydolyak case several times.

16             In any event, please proceed.

17             MR. OTLEWSKI:  Your Honor, on that I'm going to rest.

18   It is the government's view that a sentence of 18 months's

19   imprisonment, which is at the high end of the guideline range,

20   but is less than the originally imposed sentence by this Court

21   of 36 months's imprisonment, is appropriate under both the

22   guidelines and the relevant 3553(a) factors.

23             THE COURT:  Well, when imposing the last sentence, the

24   Court departed from the sentencing guideline range.  Departure

25   is the wrong term to use.  However, the guidelines are not

1  mandatory but serve as guides to the Court.  But the Court was

2  well aware of the sentencing guideline range and determined,

3  based upon the totality of the evidence, to impose a sentence

4  of 36 months and three years supervised release.

5          All right.  So the government's position is to impose

6  a sentence of 18 months.  Is that right?

7          MR. OTLEWSKI:  Yes, your Honor.

8          THE COURT:  All right.  The defense may argue its

9  position.

10         MR. FLACHSBART:  Your Honor, with your permission I'd

11  like to address just a few of the factual matters and some of

12  the pieces that Mr. Otlewski just addressed, and then turn it

13  over to Ms. Gurland to do the 3553 factors.

14         THE COURT:  Proceed.

15         MR. FLACHSBART:  Thank you.

16         I think one of the things -- I heard a lot of

17  description of the conduct from Mr. Otlewski.  And we're not

18  here to determine culpability really.  Ben pled to the conduct.

19  He admitted his wrongdoing.  He understands that it is his

20  actions that brought him here today and that have had him

21  incarcerated for the last 12 months.  We're not here really to

22  discuss --

23         THE COURT:  Let me say something here.

24         MR. FLACHSBART:  Certainly.

25         THE COURT:  You may decide to call your client Ben,

1   but the Court's position is that I will use the more formal

2   name of Mr. Pu.

3           MR. FLACHSBART:  That's fine, your Honor, and I'll go

4   by that.

5           THE COURT:  Please proceed.

6           MR. FLACHSBART:  So Mr. Pu certainly understands that

7   he is here as a result of his actions and understands the

8   seriousness of the acts.  All of the conduct that Mr. Otlewski

9   has described is built into the guideline range.  We have a

10  base offense level.  We have an increase for use of a special

11  skill.  We have an increase for use of -- we have an increase

12  for sophisticated means.  Those address the seriousness of the

13  underlying acts.

14          We also have a two-point increase for obstruction of

15  justice specifically pled to by the defendant when we entered

16  into the plea agreement.  All of these things are included.

17  And the government seems to impute that there was some plan to

18  do it a little bit without too much commitment.  But they seem

19  to impute that there was some kind of a supposed plan that

20  involved something more than what Mr. Pu already admitted and

21  pled guilty so as recited numerous times in our paper that we

22  submitted, your Honor, Monday.  Your Honor found previously

23  that the conduct that Mr Pu entered into began and ended with

24  what he did in this case.

25          The government has offered, your Honor, today no new

1   evidence supporting anything beyond that, and so to find an

2   increase -- or to move towards the higher end of the sentence

3   simply makes no sense in that context.

4           I want to address real briefly the substantial --

5           THE COURT:  Well, on that particular point --

6           MR. FLACHSBART:  Certainly, your Honor.

7           THE COURT:  -- the Seventh Circuit have quoted the

8   Court.  And that statement by the Court was extemporaneous.  It

9   was not drafted in advance.  It was the Court's reflection of

10  what it had heard up to that point.

11          Since this matter has been returned to the District

12  Court for resentencing as specifically laid out in the Seventh

13  Circuit opinion, the Court has had an opportunity to read and

14  reread the government's submission of September 18, 2014, which

15  includes conversations between the defendant and Mr. Uppal.

16          But you may go on with your argument.

17          MR. FLACHSBART:  Certainly.  I have seen those chat

18  logs, your Honor, and I have seen a bunch of -- there is

19  obviously a great number of chats in between these two young

20  men.  Much of it amounting to, I think, sound and fury

21  signifying really nothing.

22          There was no -- when our expert -- and we have

23  submitted his declaration to your Honor, and I'd invite you to

24  consider it, of course.  The -- when our expert analyzed the

25  material, he found critically lacking a few key things that he

1   would have expected to see were there some plan to do more.  He

2   saw that the Company A material had been retained but never

3   used, never touched, nothing but stored in the hard drive.

4   That the copy that was on the hard drive when it was seized was

5   a company from Mr. Pu's work space from the company when he was

6   still working there.  It didn't appear to have been accessed in

7   any way.

8          When he looked at the Citadel material, the Citadel

9   material critically had not the same level of code present.

10  The Citadel material did not have the key algorithms which were

11  necessary to make it valuable in a competitive atmosphere.  It

12  contained only outputs and a few pieces of code that were, also

13  like the Company A material, never used.  He didn't see any

14  attempts to reverse engineer.  He didn't see any attempts to

15  compile.  He didn't see any of the things that would have been

16  needed for them to make an enterprise.

17         And I think --

18         THE COURT:  Well, so is your expert saying that if the

19  defendant had gone further with what he had, that he would have

20  failed?

21         MR. FLACHSBART:  That he would have left footprints.

22  That he was going in that direction, and there just weren't

23  any.

24         THE COURT:  That with what Mr. Pu had accumulated,

25  based upon whatever it is the expert looked at, that Mr. Pu

 1    would not have been successful in his endeavor using the

 2    information he had taken from A and from Citadel?

 3              MR. FLACHSBART:  I believe that's correct, your Honor.

 4              THE COURT:  So he would have failed in his effort?

 5              MR. FLACHSBART:  Yes, that he could not --

 6              THE COURT:  Does that make a difference?

 7              MR. FLACHSBART:  I don't believe that whether he would

 8    have been successful or whether he would have failed makes a

 9    difference, your Honor, but whether he had a plan to do more.

10              THE COURT:  Well, the case law says if the scheme

11    fails or succeeds is not the issue.

12              MR. FLACHSBART:  I agree with your Honor.

13              But what we're saying is that there is no footprints

14    that there even was a serious attempt to do more.  There was

15    just nothing there.  There was no -- critically, in addition to

16    that, there was no investigation of the proper hardware that

17    would be necessary to make a high frequency trading platform

18    work, which is the kind of thing that both Mr. Pu and Mr. Uppal

19    would have known they needed and there simply was neither of

20    the acquisition of the hardware nor any research about getting

21    that kind of hardware.  It is just they weren't trying to make

22    an enterprise.

23              THE COURT:  They were recruiting, were they not?

24              MR. FLACHSBART:  They were not recruiting.  They did

25    discuss at one point.  You know, Mr. Uppal at least discussed

1  who he would get.  But they did not actually go recruit

2  anybody.  There is no evidence showing that they recruited

3  anyone.  The only evidence is chats between them.

4          In fact, in our submission, your Honor, we cite the

5  deposition of Mya Shed (phonetic) from the civil case, in which

6  she -- an outside witness with, you know, no dog in this hunt,

7  confirmed that she had reached out to Ben to see if he was

8  willing to leave Citadel, and he was not.  He was happy in his

9  work there.  The --

10          THE COURT:  He was being paid --

11          MR. FLACHSBART:  Pardon me?

12          THE COURT:  He was being paid a hundred thousand

13  dollars a year in salary, and there were bonuses that were

14  substantial.  And while he was on the payroll at A and at

15  Citadel, he was accumulating much of the information that he

16  eventually took.  In other words, his employer was not getting

17  full value of the services.

18          MR. FLACHSBART:  I don't contend, your Honor, whether

19  his employer was getting full value of his services.  Certainly

20  for people in his industry, although $100,000 certainly seems

21  like a lot to me, that is at the low end of their compensation

22  schemes.  I mean, it is -- he was a relatively low-level

23  employee.

24          And I don't contend -- there is -- we're not arguing

25  -- again we're not arguing whether or not what Mr. Pu did was a

crime.  We're not arguing whether he was improperly subject to
this Court's sentence.  He's properly being sentenced.  The
only thing that we're arguing about is where that sentence
should lie in the range that we find under the guidelines.  And
all that we're saying today to your Honor is the guideline
range properly reflects the conduct in this case.  It is all
included.  It is baked into the guideline range.

          THE COURT:  I understand your position, and it is a --
there is a great deal of merit to what you are arguing.

          MR. FLACHSBART:  Okay.

          THE COURT:  Please proceed.

          MR. FLACHSBART:  Thank you, your Honor.

          Then the only other point that I -- the only other
point that I would like to address, and then I'll talk briefly
about a couple of the other things that Mr. Otlewski said
before I turn it over to Ms. Gurland, is the substantial
invasion of a privacy interest, which the government has
injected into the proceeding at this point, that is not
something that was raised at the original sentencing hearing,
and it doesn't really seem to apply in this particular case.

          The kind of records that are typically the subject of
a substantial invasion of a privacy interest concern are
medical, educational or financial records.  We're talking about
things that are personally embarrassing to have out, that kind
of thing.  We're not talking about the trade secrets, that are

1    the very basis of the complaint here, which are the very

2    conduct that is in fact already agreed to.  It was the wrongful

3    taking of those trade secrets which are the basis of the

4    sentencing guideline range in the first place.  So we don't

5    think it is appropriate to use the back door and increase into

6    the high end of the range for a first-time offender from

7    a -- from that particular set of circumstances.

8            And obviously we laid this out in our brief.  But if

9    we look at the cases, you know, we're talking about, you know,

10   real but intangible loss in the form of embarrassment and the

11   appearance of incompetence, which certainly isn't the case

12   here.  These software packages are still being used, to our

13   understanding at least, by Citadel and Company A to this day.

14   And they are making a lot of money with them.  There hasn't

15   been any particular embarrassment to any of these companies.

16   Mr. Pu has served time in prison and has made efforts to leave

17   the financial sector and do good in the world.

18           So I just want to address a couple of the points that

19   Mr. Otlewski made, and then I'll turn it over to Ms. Gurland.

20   Mr. Otlewski said something along the lines of just collecting

21   things isn't a crime, and we certainly agree with that.  The

22   only point of Mr. Pu's collection on this case is --

23           THE COURT:  Well, you can't collect somebody else's

24   property.

25           MR. FLACHSBART:  Absolutely, your Honor, and that's

1  the conduct that we agree is wrongful, and that's the conduct

2  that's baked into the Sentencing Guidelines.

3        There was a -- there is a -- Mr. Otlewski made a

4  reference to how Mr. Pu did nothing to assist Citadel in their

5  investigation, and that's just not accurate.  He also made a

6  reference to how when the FBI seized material at Mr. Pu's

7  house, they found additional trade secret material.  Mr. Pu --

8  I'm not -- I'm certainly not going to say that what Mr. Pu did

9  was full and complete disclosure to Citadel of the trade

10 secrets that he had taken.  That certainly was not the case.

11 We have agreed with that, and that's why we pled to the

12 two-point increase for obstruction of justice.

13       But what he did do when he first was approached by

14 Citadel was he provided passwords to certain of his hard

15 drives, and he provided them with material.  Did he provide

16 them with everything he had?  He did not.  He was nervous about

17 his own personal information.  He made very bad mistakes and

18 transferred that information to someone else who put them in

19 the canal.  A hundred percent we agree that that was a mistake.

20 And just not a mistake, but bad acts, and that that resulted in

21 the increase of two points.  But he did make some efforts to

22 disclose to Citadel what had been taken.

23       When Mr. Otlewski refers to the additional trade

24 secret material that was located in Mr. Pu's home, what he is

25 talking about is one email, a paper printout of an email, that

1    was in among hundreds of other financial papers and work

2    material of Mr. Pu's.  We're not talking about like Mr. Pu had

3    held on to a hard drive with a copy of any of Company A's code

4    or any of Citadel's trade secret code.  Not the -- the critical

5    guts of what we're talking about here in this case.  He didn't

6    have anything --

7             THE COURT:  Well, the hard drive was broken with a

8    hammer.

9             MR. FLACHSBART:  There was a -- a USB.  But Mr. Pu

10   also surrendered hard drives.  And because of the -- sort of

11   the nature of Mr. Pu's data storage, most of the material that

12   eventually became the subject of this case was in fact handed

13   over by Mr. Pu to Citadel.

14            THE COURT:  Who extracted the material from the canal?

15            MR. FLACHSBART:  That was Citadel, your Honor.

16            THE COURT:  Who?

17            MR. FLACHSBART:  That was Citadel.

18            THE COURT:  All right.

19            MR. FLACHSBART:  I don't have anything further, unless

20   your Honor has some questions for me.

21            THE COURT:  No, I'll just give Mr. --

22            MR. FLACHSBART:  Well, I am going to hand it over to

23   Ms. Gurland.

24            THE COURT:  Yes, but before you do, I want to give the

25   government an opportunity to reply to what counsel has said.

1        MR. FLACHSBART:  Okay.  That's fine.  Thank you, your

2  Honor.

3        MR. OTLEWSKI:  Your Honor, I'll be brief.  To

4  defendant's point about his efforts to provide some information

5  to Citadel after he was confronted about the theft, it is a

6  classic move that this Court has probably seen in a number of

7  other cases involving fraud, theft, and deception, where

8  someone hands over a little bit, trickles out some information,

9  some of the property to return in the hopes that that appeases

10  an individual, hopes that it sets them at -- sets them off to

11  think that that's the entire world of information, while

12  keeping for their own benefit the real jewels or the real

13  benefit of whatever it was that they stole.  It is, like I

14  said, a classic move that this defendant did, handing over some

15  hard drives that contained some small bits of information, but

16  holding onto critical pieces of information on hard drives that

17  contains thousands of files that belonged to Citadel and the

18  other company, Company A, is not at all any effort to help

19  Citadel.

20        It was an effort designed to put -- to send them home

21  thinking that they had received everything and allow the

22  defendant to keep what he had.  He wouldn't have given it to a

23  friend.  He wouldn't have had that friend try to hide it when

24  Citadel was continuing to pursue him if he wasn't trying to

25  keep it out of Citadel's hand.

```
 1              THE COURT:  Well, this wasn't just a friend, this was

 2    a co-conspirator, was it not?

 3              MR. OTLEWSKI:  It was, your Honor.

 4              And the other point --

 5              THE COURT:  What happened to Mr. Uppal?  Uppal?

 6              MR. OTLEWSKI:  Uppal, and then there was this other

 7    individual --

 8              THE COURT:  What was the disposition with respect to

 9    Mr. Uppal?

10              MR. OTLEWSKI:  He received a sentence of probation,

11    your Honor.

12              THE COURT:  All right.

13              MR. OTLEWSKI:  His plea --

14              THE COURT:  He --

15              MR. OTLEWSKI:  I'm sorry.

16              THE COURT:  All right.  A judgment of conviction has

17    been entered against him.

18              MR. OTLEWSKI:  That's correct, your Honor.

19              THE COURT:  All right.  Please proceed.

20              MR. OTLEWSKI:  And, your Honor, with respect to the

21    other point that defense counsel raised at the very end about

22    this additional piece of information that was at the

23    defendant's residence when the FBI searched that apartment, I

24    want to point out a few things.  One, I never argued that it

25    was a trade secret.  I identified it as confidential business
```

1   information.

2       THE COURT:  What agreement did Mr. Pu have with

3   Company A and Citadel with respect to confidentiality?

4       MR. OTLEWSKI:  There were a number of policies that

5   the defendant signed both with -- I'm sorry -- primarily with

6   Citadel in writing about non-disclosure and confidentiality.

7       The protocols at Company A were more informal.  But

8   the culture of secrecy and the culture of confidentiality

9   existed at trade -- at that other firm, Company A, and they

10  worked with their employees to ensure that they knew to keep

11  their information secret.

12      And on that point, your Honor, what the defendant had

13  in his apartment, the defense is right, that it wasn't another

14  hard drive.  What it was though was an email between very

15  senior executives, individuals at the top of the pyramid at

16  Citadel, that was printed out from a computer, had handwriting

17  on it, and was in the defendant's apartment.  Now whose name

18  was it on that email as being to, from or CCd, the defendant's.

19  What does that tell the Court and what can you infer from that?

20  That defendant stole it.  He found it either on someone's

21  computer or near their work station and stole that confidential

22  business information.

23      That email may not have had a trade secret, but it

24  disclosed strategy from the business about its future plans.

25  Very important information that someone who is looking to build

1    a system could use to the detriment of Citadel.  It was

2    important to Citadel.  The defendant knew it, he took it, and

3    he kept it, and never gave it back.

4              THE COURT:  Does that complete your reply?

5              MR. OTLEWSKI:  It does, your Honor.  Thank you.

6              THE COURT:  Okay.  With respect to 3553 factors, you

7    may proceed.

8              MS. GURLAND:  Thank you, your Honor.

9              As the Court has already observed this morning,

10   especially in the context of a resentencing under the case of

11   United States versus Pepper, 562 U.S. 476, the Court is to

12   consider the fullest information possible concerning the

13   defendant's life and circumstances, and that includes

14   specifically the defendant's conduct from the exact day of the

15   sentencing up until present day.

16             THE COURT:  Yes.

17             MS. GURLAND:  And so I would like to address some of

18   those factors specifically for the Court.

19             At Mr. Pu's first sentence, this Court stated that

20   Ben's having left the world of finance and gone into the work

21   of teaching computers to children was a significant factor to

22   the Court.  The Court said to Ben in addressing -- sorry -- in

23   addressing Mr. Pu, the Court said, you have taken affirmative

24   and positive steps in terms of trying to help others, and in

25   this situation children, using your expertise and your skills

1  to help them, and that is something that is important to the

2  Court because what it suggests is that you are well on your way

3  toward rehabilitation.

4          THE COURT:  Is that a quote from the opinion?

5          MS. GURLAND:  This is a quote of the transcript of the

6  sentencing hearing.

7          THE COURT:  Is it contained within the opinion of the

8  Seventh Circuit?

9          MS. GURLAND:  It was not in the Seventh Circuit

10 opinion.  It was cited in our papers.

11         THE COURT:  All right.  The reason I bring that up is

12 I didn't see it in the opinion, but I do recall specifically

13 saying that.  Please proceed.

14         MS. GURLAND:  Thank you, your Honor.

15         So as of that time, the record before the Court and

16 the record that was presented to the Court when the Court made

17 those observations, was that Ben had, from the time that he

18 left Citadel, he had left the world of finance and he had gone

19 into teaching computers to children.  And there were at that

20 time a number of letters submitted to the Court by the parents

21 of the children who had taken his courses.  None of them

22 felons.  And they did write to the Court about Ben's kindness,

23 his compassion, and really that he was actually very much a

24 mentor for the children in his community, with his hard work,

25 his diligence, his skill, but also his kindness and his

1  compassion, and --

2  THE COURT:  He is doing work in the community he finds

3  himself in now.  That's similar, isn't it?

4  MS. GURLAND:  That's right, your Honor.  That's what I

5  wanted to tell your Honor was that when your Honor observed

6  that Ben -- sorry -- that Mr. Pu was well on the way to

7  rehabilitation, your Honor was exactly correct.  And what I

8  want to talk now about specifically is what happened from the

9  very day in January that the Court sentenced Mr. Pu and present

10  day.

11  And it started with Mr. Pu returning to the Boston

12  area in which he lived and returning his teaching and the work

13  that he was doing with the children.  Now what we do understand

14  is that Mr. Pu, for all of his exalted position or his, you

15  know, significant position with Citadel, he really was quite a

16  young man.

17  THE COURT:  Just a minute.  Let me also make sure --

18  Mr. Fulbright, is Mr. Pu hearing all of this?

19  THE CLERK:  Mr Pu, you're still here?

20  THE DEFENDANT:  It is a little bit difficult to hear,

21  but I'm doing my best.

22  THE COURT:  Okay.  Please speak into the microphone if

23  you would.

24  MS. GURLAND:  Yes, your Honor, I will do that.

25  THE COURT:  I just wanted to make a record on that

 1    point.  Please proceed.

 2         MS. GURLAND:  So from the time that the Court made the

 3    observation that Mr. Pu was well on the way toward

 4    rehabilitation, Mr. Pu has proven the Court to have been

 5    exactly right.  When the Court graciously gave Mr. Pu three

 6    months to wrap up his teaching in Boston, we had asked for a

 7    three-month surrender time, and the Court gave us the three-

 8    month surrender time so that Mr. Pu surrendered in May.

 9         So between January and May, Mr. Pu had time to do a

10    lot of things, which included reflecting on what for him, as

11    quite a young man, was a very scary and devastating fact which

12    was that he was soon going to have to report to prison.  And

13    what Mr. Otlewski talked about were some choices that were very

14    bad choices that Ben made in 2011 and 2010 when he committed

15    the conduct that was the subject of this case.

16         But what I'd like to talk about, your Honor, are the

17    choices and very real choices that Ben made after the time that

18    he was sentenced and the time that he reported to prison from

19    January to May.  And what he decided, the choice that he had

20    made, your Honor, was to not crawl up under the covers, not to

21    let fear paralyze him, but he chose to throw himself into

22    helping the children that he was teaching, to whom he was

23    teaching computers, and really provide a wonderful foundation

24    for them to have summer internships and to have work to do, and

25    to have substitute instructors.  He threw himself into doing

1  exactly what needed to be done in order for those children to

2  whom he was mentoring and teaching to be able to continue on in

3  what they were doing in his absence.  And I submit to your

4  Honor that given Ben's age and given the difficulties

5  psychologically of what he was on confronting, both with what

6  he had pled guilty to and what was surely going to face him,

7  which was the prison sentence, doing that was extraordinary.

8          I want to read from a letter that I'm sure the Court

9  has read, from Tracey Hiback (phonetic).  Tracey Hiback is a

10  parent.  She does not have any felony convictions.  And she's a

11  parent of a 16-year-old student that Ben was teaching.  Tracey

12  wrote a letter to the Court April 15th of this year.  And she

13  said she was struck -- she was impressed with -- and I'm

14  quoting now from her letter -- with the grace and dignity

15  throughout this process.  In particular, what I was struck by

16  was Ben's work ethic and his selflessness.  Ben seemed to push

17  himself to work harder than ever in order to leave no stone

18  unturned in preparing for the welfare of his students and

19  fellow employees of KByte Computer Science Academy.  For

20  example, he worked very hard to develop contacts with

21  researchers and business people at our local community to

22  establish summer internship and research opportunities for his

23  computer science students, all the while knowing that he would

24  not be there to see the students begin the work.  Clearly he

25  had their best interests in mind, and he did a wonderful job

1    laying the groundwork for what became a successful summer

2    program for these lucky students.

3            In addition Ben concentrated on teaching during the

4    same period.  He trained other teachers.  And even more

5    ambitiously Mrs. Hiback writes, he finished work on a learning

6    platform that presented lectures on Java programming in an

7    audio set format.  He then posted this online computer tool

8    online for his students to use, but really for anybody to use

9    free of charge.  And that was, of course, a wonderful benefit

10   to his student and was a benefit to others who might have found

11   it on the internet and made use of it.  So in a sense almost

12   sort of the opposite conduct of the conduct that landed him in

13   these problems in the first place.

14           And after May, your Honor, when Mr. Pu reported to

15   prison, he continued teaching.  And this time he didn't find

16   himself any more in a community of 16 year olds that needed

17   computer programming services, he found himself, as

18   Mr. Otlewski has pointed out, in a community of people who were

19   in prison.  And because they are in prison, I think we're not

20   surprised to learn that they had committed felonies because

21   otherwise they shouldn't have been there.  But these letters --

22           THE COURT:  Touche.

23           MS. GURLAND:  Thank you, your Honor.

24           These letters that were submitted to the Court, if the

25   implication is that they shouldn't have anything to say or that

1    they don't have any credibility because they are felons, I can

2    accept that maybe if they engaged in acts that included

3    duplicitiousness that there should be some accounting for that.

4    However, your Honor, all of the letters are -- they echo the

5    same sentiment.  And there is some reliability in that because

6    time and time again what they are writing to the Court is that

7    Mr. Pu was helpful, that he was a teacher, that he was a

8    mentor, that he was patient.  And maybe it is not so surprising

9    that given his intellectual capacity that Mr. Pu would be able

10   to help people study for the GED or that he would be able

11   to help them to write letters to their families, as many of the

12   inmates reported that he did.

13          But what I think is extraordinary about Ben's conduct

14   is that many of the letters write that he did this with

15   tremendous patience and humility and respect.  And that he

16   didn't seem to be passing judgment on the other inmates because

17   perhaps they weren't as intellectual as he was.  He was

18   compassionate.  He was patient.  And he served for them as a

19   mentor, to a point where one of the inmates, Terry McClegg

20   wrote, I think very poignantly of Mr. Pu.  He is a true light

21   in the midst of some dark and trying times.

22          And I think that the fact -- and your Honor mentioned

23   the Vrydolyak case, and I think one of the things that comes to

24   my mind is that the Seventh Circuit was saying, you know, if

25   you find yourself in a circumstance of having huge amounts of

1    money and being able to be a benefactor to so many, maybe it is

2    not such a big deal, but you are giving charitable

3    contributions, and maybe you take that with a grain of salt.

4           But I think in Ben's case, your Honor, something very

5    important to consider is that Ben found himself with the assets

6    that he had, but he was, unlike Mr. Vrydolyak, who is an older

7    person at the time of his crimes and his sentencing, Mr. Pu is

8    a very young person.  And as your Honor pointed out at the

9    first sentencing hearing, while sophisticated in some ways,

10   very unsophisticated in the ways of the world.

11          So I think that you have to consider that that is the

12   person who was able to rise to the occasion, your Honor.  And

13   after being sentenced to a 36-month jail term, left and didn't

14   -- left this courtroom and turned around and set about the work

15   of preparing adequately and -- more than adequately in an

16   exemplary fashion for his students, and then in confronting

17   what for him was a terrifying experience going away to prison,

18   confronted that experience with kindness and charity and

19   generosity to all of the other inmates or the ones at least we

20   know who wrote on his behalf, and really made a better world

21   and a better community for the people that were serving time

22   with him.  And I think particularly when you consider his age

23   and his level of inexperience in anything like the Criminal

24   Justice System, that that took a tremendous amount of

25   character, and I think that it would argue that he, as your

1    Honor has observed previously, is well on the way toward

2    rehabilitation.

3         Something that Sui Lee (phonetic), who continues to

4    be, was and is Mr. Pu's girlfriend, wrote about is that he has

5    done a lot of reading.  He has focused on positive things.  He

6    has done a lot of reading since he has been in prison.  And the

7    things that he is reading, he is reading about how to become a

8    better teacher, how to communicate information in a better more

9    successful manner to his students.  So not only has he spent

10   time while in prison working with the other inmates helping

11   them, he is trying to lay the groundwork and the foundation for

12   himself so that when he finally is able to return to his

13   students and his teaching of children in computers, that he is

14   able to do that in a way that is even more beneficial to the

15   children.

16        So I think that all of those things about Mr. Pu's

17   post-sentencing conduct should rightfully be considered by the

18   Court.  And I think that these factors, together with the other

19   factors that we have talked about today, would argue for a

20   sentence of time served.  A sentence of time served, your

21   Honor, is not in the operation of the way that the good time

22   credit works.  It would actually not be at the low end, at the

23   very low end of the sentence.  Because although Ben has served

24   more than 12 months in prison, in order to actually serve more

25   than 12 months with 85 percent -- with a 15 percent discount, I

1    should say, for good time, he would actually have to have been

2    sentenced to approximately 14 months.  Because once you account

3    for the 15 percent discount, it would basically -- to sentence

4    Ben to time served would be a guideline sentence, and it would

5    be approximately a 14-month sentence.  And that's what we're

6    asking for today, your Honor.

7           And just specifically on other 3553(a) factors that

8    the government had cited.  On specifics and general deterrence,

9    on specific deterrence, you know, this ordeal has gone on for

10   Mr. Pu for five years.  He lost his job.  He lost the

11   opportunity to ever work in finance again.  He lost the respect

12   of his peers.  He lost certain standing in the community.

13   There was five years of tremendous uncertainty in the case

14   because his guideline range was 87 to 104.  Of course the Court

15   departed significantly from that.  But in confronting the

16   day-to-day reality from 2011 up until 2015 when he was

17   sentenced, Mr. Pu certainly had no guarantee that he wasn't

18   going to have what might have been sort of a life-altering

19   sentence.  And he dealt with that uncertainty.  And then he --

20   we have not spoken about this very much at this sentencing, but

21   he was in a very debilitating car cash, such that physically he

22   is limited.  And both being a young person and being physically

23   limited made going to prison a horrifying experience for him.

24           THE COURT:  His mother discussed that in her letter to

25   the Court.

1          MS. GURLAND:  Thank you, your Honor.

2          So for all of those reasons, Ben himself has been

3     through a considerable amount of punishment in this case.  And

4     I don't think that it would denigrate respect for the law nor

5     do I think that it would be unfair nor do I think it would not

6     be enough of a deterrent to others if anybody could see what

7     the result was of Ben's conduct because the results for Mr. Pu

8     of his conduct have been nothing short of devastating.  And I

9     don't believe that any further punishment is warranted in this

10    case to either send a message to Ben, who would never find

11    himself in this circumstance again, nor is it necessary to send

12    a message to others because what has already happened to Ben

13    tells people loud and clear that they must not engage.

14         In terms of respect for the law, your Honor, all of

15    the same reasons exist for leniency as existed at the time of

16    the original sentence.  And indeed many more reasons exist

17    today because now we have had an ability to see what Mr. Pu was

18    going to do with the time from the time of the sentence and to

19    present day.  And I would submit to your Honor that in all of

20    those aspects, Mr. Pu has done more than just perform

21    adequately, he has done more than just survive, Mr. Pu has

22    truly excelled in every opportunity that has been given to him,

23    to be compassionate, to be helpful, and to show good character,

24    he has done that, and he has done that to an extraordinary

25    level.

1    In terms of unwarranted sentencing disparities, your

2  Honor, there was something in the government's brief in that

3  section in which they argue that six of the seven defendants in

4  other trade secret cases have received below guideline

5  sentences.  They took some objection to that.  I would submit

6  to your Honor, the unwarranted disparity factor is for just

7  that.  It is to prevent defendants from being sentenced to

8  different, to widely divergent outcomes but similar conduct.

9  But I would submit that Mr. Pu is different from the defendants

10  in all of those cases, even defendants who received below

11  guideline sentences because --

12    THE COURT:  You're saying his conduct is different or

13  is he different as an individual?

14    MS. GURLAND:  Both of those things are accurate, your

15  Honor.  Although I don't have full information about those

16  defendants, there is two things I know.  One is that in each of

17  the cases that we cited in our brief, those individuals put the

18  government to their proof and went to trial.  They did not do,

19  as Mr. Pu did, and come forward and say, I did it, I took trade

20  secrets, and I obstructed justice besides.  They didn't do

21  that.  They didn't admit their misconduct, and they were

22  instead found guilty after trial.

23    In addition, they went and approached competitors and

24  asked for huge sums of money to hand over trade secrets of

25  their employer.  And there is nothing like that in this case.

1    Ben did no such thing.  There is no evidence or suggestion of

2    any of that.  In addition, your Honor, we are actually seeking

3    an in guideline sentence.  We are not seeking a below guideline

4    sentence because at this juncture to sentence Mr. Pu to time

5    served would be, as I had mentioned, the approximation of a

6    14-month sentence.

7            So, your Honor, I will conclude by mentioning that --

8    or sharing with the Court my sincere gratitude for the Court's

9    having carefully read and gone through the material and

10   listened to our arguments now not once but twice.  I believe --

11           THE COURT:  Well, you can stop there.  Gratitude is

12   not the issue.  Continue with your argument.

13           MS. GURLAND:  I believe that Mr. Pu should be

14   sentenced to time served.  He has endured significant,

15   significant punishment.  The punishment has been enough.  I

16   respectfully ask this Court to sentence him to time served and

17   allow him to come back to his community and continue being the

18   teacher, the mentor, and the rehabilitated individual that he

19   is and has become.  Thank you, your Honor.

20           THE COURT:  The government may reply.

21           MR. OTLEWSKI:  There is nothing further from the

22   government, your Honor.

23           THE COURT:  Mr. Pu, are you with us?

24           THE DEFENDANT:  Yes.

25           THE COURT:  Can you hear me, Mr. Pu?

1        THE DEFENDANT:  Yes, I can hear you.

2        THE COURT:  You have the right to make a statement

3  before the sentence is imposed.  You also have the right to

4  remain silent, which means to say something.  If you do wish to

5  speak, this is your opportunity to do so the.

6        THE DEFENDANT:  Well, normally if I was sitting next

7  to my attorneys, I would ask them what they recommend.

8        THE COURT:  Well, I'll step out of the room for a

9  couple minutes, and you can do that.

10       MR. FLACHSBART:  You don't need to do that, your

11  Honor.

12       THE COURT:  I'll step out.

13    (Brief recess.)

14       THE COURT:  Mr. Pu, have you had an opportunity to

15  confer with your attorneys?

16       THE DEFENDANT:  Yes.  I'm going to go forward with

17  making a statement.

18       THE COURT:  As I said before, you have a right to make

19  a statement if you choose to do so.  You may proceed.

20       THE DEFENDANT:  Okay.  Thank you, your Honor.

21       First, I want to express my sincere regret for the

22  actions I took that led me to this case.  And I understand that

23  the prosecutors say that the punishment is not yet enough, but

24  with respect I disagree.  This started for me in 2011.  I have

25  lost -- my family suffered.  I have been charged with a major

felony crime.  I have served over a year in prison.  It has
been absolutely devastating to me and my family.  And during
that time in prison, I am trying my best, trying to work on my
future.  And by that I mean to learn, keep learning, keep
bettering myself, and also to understand how to be a better
teacher for other people, for young people, for example.  That
is what I plan to return to when I am released.

So if your Honor would agree to allow me to return
home to work, I will first try to make up to my family, my
girlfriend.  I couldn't have made it this far without them.
And then I will try to use my time teaching, help young people,
and help kids.  I hope that -- you know, really very inclusive
lives, and I would never do the actions that put me in this
position.  So, yes, thank you, your Honor, for all your time.
Thank you for the attention you have brought in this case, both
now and also, you know, in January last year.  That's all I
have to say.  Thank you.

THE COURT:  Do you want to say anything about Citadel
or Company A?

THE DEFENDANT:  I thoroughly apologize for my actions.
I don't entirely believe that I agree with the severity of the
government characterizing my intent.  I really did not believe
I was harming them at that time as much as they claim they
thought I was.  I really made a grave mistake in that respect.
In hindsight a lot of my actions I wish I could take back.  I'm

1  sorry for what I caused.  I'm sorry for the cost.  I will do my

2  best going forward to make the world better in that regard.

3          THE COURT:  Do you want to say anything further?

4          THE DEFENDANT:  No, your Honor, that's all I have to

5  say.

6          THE COURT:  Fortunately for Mr. Pu, the Bureau of

7  Prisons had the presentence investigation report, which was

8  very comprehensive and very well done by an experienced

9  probation officer.  And they made a very appropriate job

10  placement to put Mr. Pu into a position, once again, to work

11  with computers.  So he left the computer world as a free person

12  and returned to the computer world, to a certain extent, as an

13  incarcerated individual.  Fortunately for him he didn't end up

14  in the kitchen or making furniture.  He was in a position to

15  use his skills to his personal advantage and well beyond that

16  to the advantage of the other inmates with whom he came in

17  contact.

18          The letters by those individuals should be and will be

19  given appropriate weight.  They appear to be sincerely written.

20  And so I will take into account those letters as well as the

21  letter of the mother of Mr. Pu, who points out, again, the

22  difficulties he has had over a period of time since a terrible

23  accident that he was involved with.

24          And so the Court has looked at all the 3553 factors.

25  They are well developed by counsel in this case.  One key point

1    is the gravity of the conduct of the defendant.  What is it

2    that he did?  And that is clear in terms of what he pleaded to

3    and the factual basis for his plea of guilty.  His conduct was

4    very grave in terms of the trade secrets taken from the victim

5    or victims in this case.  It cannot be underestimated or

6    underplayed.  To have access to such valuable intellectual

7    property is immense, to have access to it and to breach trust

8    and take it from the employer or employers in this case.

9         So the Court is not dealing with loss, actual or

10   intended, because counsel have agreed that there is no loss.

11   And when the Court inquired, the government said no actual loss

12   and no intended loss.  So I am disregarding that.  The issue of

13   restitution remains before the Court, however.

14        So I have focused on the gravity of the conduct.  And

15   also two extremely important factors.  One is deterrence.  I'm

16   less concerned about deterrence as to Mr. Pu.  Although he does

17   continue to have access to computers and related technology and

18   there is always the potential for a future unlawful conduct on

19   his part.  Although as argued very eloquently by his counsel,

20   there is nothing at this juncture to indicate in any way that

21   he is likely to commit crimes in the future.

22        Also there is the important factor of general

23   deterrence.  You have personal deterrence as to Mr. Pu.  But

24   general deterrence so that others who would find themselves in

25   a similar position would not violate the law.  And as counsel

1   has brought to the attention of the Court, there are at least

2   five other cases of significance with similar circumstances and

3   similar violations of the law.  And so general deterrence is a

4   major factor as well.

5           In addition to all of that, to impose a sentence that

6   is too light would deprecate the seriousness of what has

7   actually occurred in this case.  It is correct to say that

8   Mr. Pu seems to be moving well along on the road toward

9   rehabilitation.  Of course he has a way to go.  And that can be

10  covered in terms of supervised release conditions, those that

11  were previously imposed by the Court.

12          So I have looked at all of this material time and

13  again and heard the very meritorious arguments of all counsel

14  in this case.  The range is 12 to 18 months.  It is the

15  judgment of the Court that the defendant is committed to the

16  Bureau of Prisons to serve 18 months in the Bureau of Prisons

17  for the reasons I have just indicated.  It is the gravity of

18  the conduct, the need for general deterrence, and so as not to

19  deprecate the seriousness of what actually has occurred in this

20  case.

21          So 18 months in the Bureau of Prisons.  Of course he

22  is working well along in getting credit for good time served.

23  I would hope that that will continue, but that is something for

24  him and the Bureau of Prisons to deal with.  It is the judgment

25  of the Court that the defendant serve 18 months in the Bureau

1    of Prisons.

2           The sentencing in this case is not yet complete

3    because of the restitution issue, and we have continued that to

4    a future date.  And so since the judgment itself is not

5    complete, it may not be necessary to advise Mr. Pu of his

6    appellate rights.  If he perceives this judgment as complete or

7    if counsel see this judgment as complete, then of course any

8    notice of appeal would have to be filed within 14 days in the

9    Clerk's Office.  Mr. Pu could file that himself.  And if Mr. Pu

10   could not afford counsel for purposes of the appeal, the Court

11   would appoint counsel.  But my view of the matter is that while

12   this restitution issue remains, the judgment is not yet

13   complete.

14          What is the government's position regarding finality

15   of this judgment?

16          MR. OTLEWSKI:  We need to resolve the restitution,

17   your Honor.

18          THE COURT:  So your position is that the judgment is

19   not yet complete.

20          MR. OTLEWSKI:  Correct.

21          THE COURT:  What's the defendant's position?

22          MR. FLACHSBART:  It is the same, your Honor.

23          THE COURT:  So we will deal with advising Mr. Pu of

24   appellate rights after the restitution is determined by the

25   Court.  I've given you a future date.  There are many ways to

1   resolve this issue.  Thank you, counsel.

2            MR. FLACHSBART:  Thank you, your Honor.

3            MR. OTLEWSKI:  Your Honor, I'm sorry, there are a few

4   other matters.  In light of the Seventh Circuit's decisions in

5   recent history regarding conditions of supervised release.

6            THE COURT:  Well, we can take those up on the next

7   date.  If they need revision or modification, I will ask the

8   probation officer -- were you the original probation office in

9   this matter?

10           MS. RICE:  I was her supervisor.

11           THE COURT:  So much the better.  So looking at the

12  conditions of supervised release, update your recommendations.

13  And we can deal with that on the next hearing as well.

14           MS. RICE:  Your Honor, I will file something.

15           THE COURT:  Thank you.

16           MR. OTLEWSKI:  No, your Honor, thank you.

17           MR. FLACHSBART:  Thank you, your Honor.

18        (Which concluded the proceedings:)

19                         CERTIFICATE

20           I HEREBY CERTIFY that the foregoing is a true, correct

21  and complete transcript of the proceedings had at the hearing

22  of the aforementioned cause on the day and date hereof.

23  /s/Pamela S. Warren                November 29, 2016
    Official Court Reporter                    Date
24  United States District Court
    Northern District of Illinois
25  Eastern Division