```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   UNITED STATES OF AMERICA,          )
                                        )
 4              Plaintiff,              )
                                        )
 5              vs.                     )  No. 11 CR 699-1
                                        )
 6   YIHAO PU, also known as Ben Pu,    )  Chicago, Illinois
                                        )  May 16, 2016
 7              Defendant.              )  11:30 A.M.

 8              TRANSCRIPT OF PROCEEDINGS - Status
          BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
 9
     APPEARANCES:
10
     For the Government:      HON. ZACHARY FARDON
11                            219 South Dearborn Street
                              Chicago, Illinois  60604
12                            BY:  MR. PATRICK MARK OTLEWSKI

13   For the Defendant:       FLACHSBART & GREENSPOON, LLC
                              333 North Michigan Avenue
14                            27th Floor
                              Chicago, Illinois  60601
15                            BY:  MR. WILLIAM W. FLACHSBART

16                            MS. CAROLYN PELLING GURLAND
                              414 North Clay Street
17                            Hinsdale, Illinois  60521

18   ALSO PRESENT:           Ms. Kelly A. Rice

19

20              PAMELA S. WARREN, CSR, RPR
                   Official Court Reporter
21               219 South Dearborn Street
                         Room 2342
22               Chicago, Illinois  60604
                      (312) 408-5100
23

24

25
```

1      (Proceedings had in open court.)

2          THE CLERK:  11 CR 699, United States versus Yihao Pu,

3  also known as Ben Pu, status.

4          MR. OTLEWSKI:  Good morning, your Honor.  Pat Otlewski

5  on behalf of the United States.

6          THE COURT:  Good morning, counsel.

7          MS. GURLAND:  Good morning, your Honor.  Carolyn

8  Gurland and Will Flachsbart on behalf of Ben Pu.

9          THE COURT:  Good morning, counsel.

10         MR. RICE:  Kelly Rice from probation.

11         THE COURT:  Good morning.  What is the limited issue

12 before the Court today?

13         MS. GURLAND:  The limited issue before the Court, your

14 Honor, is that on behalf of the defendant Mr. Pu we are

15 requesting that the Court -- that we determine the period of

16 supervised release to be added to the -- at the end of his

17 18-month sentence, and that there be a judgment that issues

18 that says that the sentence is the 18 months that your Honor

19 decided.  The purpose of that is that evidently, although we

20 didn't appreciate this at the time of the sentencing, unless

21 the order has issued, the Bureau of Prisons is not able to do

22 the processing and calculations that they need to do to figure

23 out when Ben would be released.  So we have asked to have that

24 matter clarified.  We have our position if your Honor would

25 like it on what the period of supervised released and the

1  conditions should be or perhaps you would like to hear from the

2  government first on that issue.

3      THE COURT:  Well, first let me say that this Court

4  does not entertain motions by way of letters to the Judge.  And

5  what I have here is a letter which says, Dear Judge Norgle.

6  That in my view is not a pleading.  That is an unsolicited

7  communication with a Judge.  And there is a copy, of course, to

8  the government.  But that's not the way we do it in the

9  Northern District of Illinois or certainly in this court.

10     MS. GURLAND:  We did file a motion, your Honor.  I can

11 hand it up.

12     THE COURT:  You did?

13     MS. GURLAND:  We did also.

14     THE COURT:  What is the date of that?

15     MS. GURLAND:  It was May 11th.

16     THE COURT:  All right.  And so you call it

17 supplemental memorandum in support of sentencing.

18     MS. GURLAND:  Supplemental --

19     THE COURT:  Does that supplement the letter?

20     MS. GURLAND:  No, I would think it would be

21 supplemental to our -- supplemental to our sentencing

22 memorandum in aid of the sentencing.

23     MR. FLACHSBART:  Your Honor, if I may, it was meant to

24 replace the letter.  Mr. Otlewski asked us that we file

25 something with the Court, and we did so.  Much of the material

1    is the same, with the exclusion of we removed any challenge to

2    the conditions of release for only the 300 hours of community

3    service.

4              THE COURT:  First the issue of restitution is still

5    before the Court.

6              MS. GURLAND:  Yes, that's correct, your Honor.

7              THE COURT:  And that is set for what date?

8              MS. GURLAND:  June 8th -- 7th.

9              THE COURT:  Well, that date will stand in terms of

10   restitution.

11             MS. GURLAND:  Yes.

12             THE COURT:  But I don't intend to enter an order today

13   that would be a final and appealable order today.  I want to

14   include in any final and appealable order the issue of

15   restitution which is still before the Court.

16             Now on the issue of whether the supervised release

17   should be the 36 months or 18 months, what is the government's

18   position?

19             MR. OTLEWSKI:  Your Honor, we believe that a period of

20   18 -- I'm sorry -- of 36 months, not 12 months as recommended

21   by the defendant, is appropriate.

22             THE COURT:  Eighteen months is recommended by the

23   defendant.

24             MR. OTLEWSKI:  They recommended 12 months --

25             THE COURT:  Excuse me.

1    MR. OTLEWSKI:  -- in their supplemental memorandum.

2  It appears in the letter they 18, but they have dropped that

3  number six months.

4    THE COURT:  Is that right?

5    MR. FLACHSBART:  It was a typo, your Honor, yes.  But

6  18 obviously --

7    THE COURT:  Pretty big typo.

8    MR. FLACHSBART:  Yes, your Honor.

9    THE COURT:  Okay.  And so you're recommending a year

10  rather than three years.

11    MR. FLACHSBART:  Correct, your Honor.

12    THE COURT:  You may argue your position.

13    MR. OTLEWSKI:  Your Honor, before we do that,

14  obviously since this proceeding relates to sentencing, the

15  defendant has a right to be present under the rules.  If the

16  defendant is voluntarily absent, the Court can proceed.  I

17  haven't heard anything from defense counsel on whether the

18  defendant has voluntarily waived his appearance for purposes of

19  us addressing what is his sentence -- what will be a part of

20  his sentence.

21    MS. GURLAND:  He has voluntarily -- he voluntarily

22  waives his appearance.

23    THE COURT:  I will accept your representation that you

24  have conferred with him and that he has waived his right to be

25  personally present.

1          All right.  So with respect to the period of

2     supervised release, we also have a probation officer who is

3     present.

4          From the probation department's position, what is your

5     recommendation regarding the length of supervised release?

6          MR. RICE:  Your Honor, I did not write the initial

7     report.  And you know her recommendation was 36 months at that

8     time.  So I just stuck with her initial recommendation since

9     she's the one who did all the investigating.

10         THE COURT:  That's an appropriate and honest answer.

11    Thank you.

12         What is the government's position?

13         MR. OTLEWSKI:  Your Honor, we're recommending it -- we

14    agree with the probation's officer recommendation of 36 months.

15    There is one significant factor that weighs in favor of that

16    length.  Your Honor, as the Court is aware, a significant part

17    of the defendant's sentence will be the amount of restitution,

18    what the government expects to prove to be approximately

19    $760,000.  In order to ensure the defendant's continued ability

20    to make restitution, have the financial ability to make that

21    restitution and guidance from probation, it seems appropriate

22    to have a substantial period of time consistent with what's

23    required under the statute for restitution to make that

24    restitution under the probation office's guidance.

25         THE COURT:  So if the defendant made the restitution

1    immediately, as he's required to, would you then agree that the

2    period of supervised release should be a year?

3              MR. OTLEWSKI:  Your Honor --

4              THE COURT:  I should say in the unlikely event that.

5              MR. OTLEWSKI:  In the event that we have early

6    restitution, the government often does come back and present

7    those facts to the Court and say -- or either recommend an

8    early termination of supervised release or modify the

9    conditions of supervised release accordingly.

10             THE COURT:  All right.  So your principal argument is

11   the restitution issue.

12             MR. OTLEWSKI:  Correct, your Honor.

13             THE COURT:  Are there any other points to support your

14   position?

15             MR. OTLEWSKI:  No, your Honor.

16             THE COURT:  Okay.  The defendant may argue.

17             MS. GURLAND:  Thank you, your Honor.

18             The defense position -- I believe that where the

19   36-month number came from that was included in the PSR or that

20   was included in the recommendation, I should say, from

21   probation was that your Honor had originally sentenced Mr. Pu

22   to 36 months, and that that number simply paralleled what the

23   Court's decision was.

24             I would respectfully submit that with an 18-month

25   sentence, 18 months, or 12 months that we have asked for,

1    either one or more appropriately tailored to the time of the

2    sentence.

3         Mr. Pu, as we discussed -- as I discussed and

4    Mr. Flachsbart discussed with this Court in detail at the

5    sentencing will have a job.  He will be teaching.  He will be

6    returning to teaching.  In fact, we talked about all of the

7    efforts he has made to prepare himself for that endeavor.  And

8    he will doubtlessly be paying a percentage.

9         Also the -- he will be paying a percentage from that

10   income, which he expects to have when he is released.  And that

11   I don't believe that it is necessary for him to be under the

12   watch of the probation office to make that restitution.

13        It is also the case that even at the end of his term

14   of supervised release, he will still have the obligation and he

15   will still be under the -- he will still be under the Court's

16   watch and will have to pay what -- the 10 percent a month

17   continuing on until it is finally paid.  So I don't believe

18   that being on paper with the probation office adds anything to

19   that, especially in a circumstance in which the probation is

20   here, and he is in Boston.

21        THE COURT:  What is your reply?

22        MR. OTLEWSKI:  Your Honor, it is my understanding that

23   the defendant will be supervised by a probation officer in the

24   district where he is released on supervised release.

25        And also, your Honor, as the special conditions of the

1  probation officer has --

2          THE COURT:  Well, we'll get to the special conditions.

3  At the moment we're talking about length.

4          MR. OTLEWSKI:  Length.  And one of those special

5  conditions is appropriate to discuss the length.  One of the

6  things that the probation officer recommends is that the Court

7  impose a requirement that the defendant not incur new credit

8  charges or open additional lines of credit.  Obviously that

9  deals with the matter of financial responsibility when a

10  defendant is faced with a potential $760,000 amount of

11  restitution.  Having the defendant under probation's guidance,

12  with conditions like that, makes sense when financial

13  responsibility will be a significant part of the defendant's

14  supervised release.

15          THE COURT:  One of the issues brought to the Court's

16  attention by virtue of the Seventh Circuit opinion is that the

17  Court did not articulate sufficiently to support what the Court

18  had done.  And the way this case has evolved, it would appear

19  that Mr. Pu is virtually without fault, that's just a nice guy

20  who got caught up under the circumstances.  He's well on the

21  path to rehabilitation.  He is going to get a job teaching

22  children, and we lose sight of the gravity of what he actually

23  did.

24          And so with an abundance of caution and prudence, I am

25  going to read into the record some portions of the plea

1   agreement so that it is clear that there is a substantial

2   reason for the sentence imposed by the Court, and eventually

3   for the period of supervised release that will be imposed, and

4   the conditions.  And so this will take a while.  All of this

5   has already been spread of record but not much attention was

6   paid to it on appeal, I feel.

7         So, counsel, you may be seated.  This is going to take

8   a while.

9         So from on or about July 27, 2009, through on or about

10   March 26, 2010, Pu was employed by Company A as a quantitative

11   analyst.  As a quantitative analyst, Pu's primary

12   responsibilities included testing and analyzing HFT strategies.

13         From on or about March 2010 until August 27, 2011, at

14   Chicago, Pu, with the intent to convert a trade secret to the

15   economic benefit of someone other than the owner, knowingly did

16   possess a trade secret belonging to Company A, file one, which

17   contained Company A's HFT strategy and infrastructure source

18   code, such as trade secrets being related to and included in a

19   product that was produced for and placed in interstate commerce

20   intending and knowing that the offense would injure Company A

21   and knowing that trade secret was stolen and appropriated,

22   obtained, and converted without authorization.  And

23   specifically Mr. Pu said that on or about March 25th, 2010, a

24   day before he resigned from Company A, Pu downloaded and

25   transferred from Company A's computer system thousands of files

1   containing Company A's business information, thousands of
2   files, and copied those files onto Pu's personal hard drive.
3   Among the files Pu transferred was file one, which contained
4   Company A's HFT strategy and infrastructure source code.
5           Pu kept file one on his Seagate hard drive.  File one
6   was a trade secret belonging to Company A, and Company A took
7   reasonable measures under the circumstances to keep file one
8   secret.  The information contained in file one was not
9   generally known to the public and was not readily ascertainable
10  through proper means by the public.  The information contained
11  in file one derived economic value from not being generally
12  known and readily ascertainable through proper means by the
13  public.  File one was related to the purchase and sale of
14  publicly traded stocks on financial markets in the United
15  States by individuals located throughout the United States and
16  abroad.
17          Pu knew that he obtained file one without
18  authorization from Company A, and Pu intended to convert the
19  trade secret to the economic benefit of himself, not Company A,
20  the owner of the trade secret.  Pu knew that this
21  misappropriation of file one would injure Company A.
22          From on or about March 2010 until August 27, 2011, at
23  Chicago, Pu, with the intent to convert a trade secret to the
24  economic benefit of someone other than the owner thereof,
25  knowingly and without authorization did possess a trade secret

1  belonging to Company A, file number two, which contained

2  Company A's source code for computer programs relating to

3  Company A's HFT strategy and infrastructure software.  Such

4  trade secret being related to and included in a product that

5  was produced for and placed in interstate commerce, foreign

6  commerce, knowing that the trade secret was appropriated,

7  obtained, and possessed without authorization.

8          The plea agreement goes on to say that specifically on

9  or about March 25, 2010, a day before Pu resigned from Company

10 A, Pu downloaded and transferred from Company A's computer

11 system onto Pu's personal hard drive file two, which contained

12 Company A's source code for computer programs related to

13 Company A's HFT strategy and infrastructure and software.  Pu

14 kept file two on his Seagate hard drive.  File two was a trade

15 secret belonging to Company A, and Company A took reasonable

16 measures under the circumstance to keep it secret.

17         The information in file two was not generally known to

18 the public and was not immediately ascertainable through proper

19 means by the public.  The information contained in file two

20 derived economic value from not being generally known and

21 readily ascertainable through proper means by the public.  File

22 two was related to the purchase and sale of publicly traded

23 stocks on financial markets in the United States by individuals

24 located throughout the United States and abroad.  Pu knew that

25 he obtained file two without authorization from Company A.  Pu

1    intended to convert the trade secret to the economic benefit of

2    himself, not Company A the owner of the trade secret.  Pu knew

3    that his misappropriation of file two would injure Company A.

4           Pu then moved on to Citadel.  Citadel required

5    employees to sign a non-disclosure agreement in which Citadel

6    employees agreed to use confidential information only as

7    required to perform their duties for Citadel and not for their

8    personal benefit or for the benefit of any other individual or

9    entity.

10          I'm not reading the entire written plea agreement

11   verbatim, but taking parts of it.

12          MS. GURLAND:  Your Honor, can I -- I have had a

13   meeting with a whole front office of the U.S. Attorney's Office

14   in another case scheduled for --

15          THE COURT:  You may leave the room if you choose to.

16   Your colleague will remain.

17          MS. GURLAND:  Is that all right, your Honor?

18          THE COURT:  Yes, indeed.

19          MS. GURLAND:  Thank you.

20          THE COURT:  The non-disclosure agreement defined

21   confidential information as including information relating to

22   Citadel's internal financial affairs, strategies, portfolio

23   holdings, portfolio management techniques, quantitative

24   analytics, and models used to evaluate financial instruments

25   proprietary software, including the proprietary system

1   architectures and Citadel's business and investment process.

2   It was material to Citadel that its employees used Citadel's

3   confidential business information in a manner consistent with

4   Citadel's employee handbook non-disclosure agreement and

5   policies.

6          Page 10 goes into great detail as to Citadel's trade

7   secrets, as does page 11.

8          Now with respect to Pu's employment at Citadel, in or

9   about May 2010, through on or about August 30, 2011, Pu was

10  employed by Citadel as a quantitative financial engineer.  As a

11  quantitative financial engineer, Pu's primary job

12  responsibilities included working with analysts and researchers

13  to develop and enhance certain of Citadel's HFT's strategies.

14  On or about March 25, 2010, Pu signed Citadel's non-disclosure

15  agreement.  On or about May 17, 2010, on or about his first day

16  of employment at Citadel, Pu signed Citadel's employee handbook

17  acknowledgment form.  That was his first day on the job.  And

18  in that form he acknowledged that he was responsible for

19  reading the employee handbook, familiarizing himself with its

20  contents, and adhering to all the policies and procedures of

21  Citadel.  On June 15th of 2010 and again on August 1, 2011, Pu

22  certified that he had received Citadel's policies and

23  procedures and that he understood that he was obligated to

24  comply with them.

25         Between on or about August 9th, 2011, and on or about

1    August 26, 2011, here in the Northern District of Illinois, Pu,
2    with the intent to convert a trade secret to the economic
3    benefit of someone other than the owner thereof, knowingly, and
4    without authorization, did copy, duplicate, download, upload,
5    replicate, and transmit a trade secret belonging to Citadel;
6    namely, file number three, which contained alpha data and term
7    data, such trade secret being related to, included in a product
8    that was produced for and placed in interstate commerce
9    intending and knowing that the offense would injure Citadel,
10   his employer.
11          Specifically, beginning on or about November 11, 2010,
12   Pu circumvented Citadel's computer securities measure in order
13   to allow him to download and transmit Citadel's trade secrets
14   from Pu's work computer to Pu's personal electronic storage
15   devices.  Pu, without the required authorization from Citadel,
16   created two virtual machines on his Citadel work computer.
17   These virtual machines allowed Pu to access computer ports that
18   Citadel previously disabled and further allowed Pu to gain
19   unauthorized access to Citadel's computer system.  Pu used his
20   unauthorized access to the work computers's ports to connect
21   his own personal electronic devices to the Citadel computer
22   system.  Pu then encrypted one of the virtual machines which
23   concealed its contents.  Pu did not disclose to Citadel that he
24   had manipulated its computer systems.
25          Pu further admitted at the time the plea was accepted

that between on or about August 9th, 2011, and on or about

August 26, 2011, Pu used his virtual machines to connect

personal electronic storage devices to ports on his Citadel

work computer.  Pu then downloaded, copied, and transmitted

file three which contained Citadel's alpha data and term data

from Citadel's computer system to Pu's own personal electronic

storage devices.  Pu kept file three on his Western Digital

hard drive.  In order to commit and facilitate his commission

of the theft of three from Citadel, Pu also used his computer

and a Hitachi hard drive, serial number is mentioned in the

agreement, and a Motorola droid phone.

File three was a trade secret belonging to Citadel.

Citadel took reasonable measures under the circumstances to

keep file three secret.  The information contained in file

three was not generally known to the public and was not readily

ascertainable through proper means by the public.

The information contained in file three derived

economic value from not being generally known and readily

ascertainable through proper means by the public.  File three

was related to the purchase and sale of publicly traded

financial instruments on financial markets in the United States

and abroad.  Pu knew that when he obtained file three without

the authorization from Citadel that he intended to convert the

trade secret to the economic benefit of himself, not Citadel,

the owner.  Pu knew that his misrepresentation,

1    misappropriation of file three would injure Citadel.

2         Page 14 of the written plea agreement goes on in

3    detail, once again, with respect to files four, five, six,

4    seven, eight, and nine.  It goes into great details in terms of

5    what he did regarding those files.

6         Now the plea agreement then on page 15 goes into more

7    detail as to what Mr. Pu actually did in this case.  On or

8    about August 26, 2011, Citadel representatives confronted Pu

9    concerning the unauthorized virtual machines on his Citadel

10   work computer.  Citadel representatives instructed Pu to return

11   to Citadel and preserve and not destroy any of Citadel's

12   confidential information in his possession.  Pu was further

13   instructed to refrain from deleting, overwriting, altering, and

14   modifying any documents, records, and electronic files relating

15   or referring to Citadel.

16        On or about August 26, 2011, Pu, acting with a belief

17   that a federal investigation into his conduct might begin at

18   some point in the future, with the assistance of Individual A,

19   concealed and transferred from Pu's apartment to Individual A's

20   apartment computer equipment, including the Seagate hard drive

21   which contained file one and file two, along with large amounts

22   of Pu's personal files and the Hitachi hard drive, which

23   contained file five and six with large amounts of Pu's personal

24   files.

25        On August 27, 2011, Pu went to Individual A's

residence, and Pu set up his computer equipment and erased data from certain of the hard drives. This he did at A's residence.

On or about August 28, 2011, Pu agreed to have Individual A dispose of certain computer equipment, including the Hitachi hard drive. Individual A took six of Pu's hard drives, including the Hitachi hard drive, and discarded them into a sanitary canal near Wilmette Harbor in Illinois. Pu also asked Individual A to hide the Seagate hard drive with which Individual A did.

Pu also from on or about August 26, 2011, to on or about August 28, 2011, here in the Northern District of Illinois, together with A, knowingly altered, destroyed, concealed, and covered up a record, document, and tangible object; namely, computer equipment that contained electronic documents and files containing proprietary and confidential information of Company A and Citadel. And they did so with the intent to impede, obstruct, and influence the investigation and proper administration of any matter within the jurisdiction of any department and agency of the United States in relation to and contemplation of any such matter and case in violation of 18 U.S.C 1519.

These are things that the defendant admitted to in the written plea bargain agreement. We also have learned along the way that Mr. Pu destroyed a hard drive with a hammer. So I'm reading this and, once again, making the point of the gravity

1    of what Pu did.

2            There is a great deal of other information before the

3    Court contained in the original presentence investigation

4    report, the submissions of the government, and also the

5    defendant.

6            And so given all of this background, this is not a

7    case that would lend itself to a short period of supervised

8    release.  This -- this defendant, Mr. Pu, is someone that has

9    to be watched over an extended period of time.  He has to be

10   supervised.  There must be written conditions that he's

11   obligated to follow, one of which, obviously, is the

12   restitution.

13           So in terms of length, the Court rejects the position

14   of the defendant that it be one year and agrees with the

15   government and probation that the period of supervised release

16   should be 36 months.  A key factor, obviously, is the

17   restitution which is still to be determined by the Court.

18   There is no doubt that the restitution in this case will reach

19   hundreds of thousands of dollars.  The Court has yet to deal

20   with the specifics regarding restitution.  The government's

21   position remains, as I understand it, that it is still $750,000

22   that is challenged by defendant, and we have set that for a

23   future date to deal with the issue of restitution.  But the

24   length of supervised release, given the circumstances in this

25   case, will be three years and certainly not one year.

1          Now there are a number of recent cases that say the

2     conditions of supervised release must be read in open court.

3     Under 18 U.S.C. Section 3583(a), and recent cases of the

4     Seventh Circuit, bringing this to the attention of the Court,

5     quote, only punishment stated orally in open court at

6     sentencing are valid.  Because supervised release is part of

7     the sentence, the Court must also orally pronounce both its

8     oral imposition and its conditions.

9          And so, first, there is a disputed condition, and that

10    is Condition 13.  Is that right?

11         MR. FLACHSBART:  Your Honor, the only condition that

12    is disputed is Condition 12, your Honor, which is his work and

13    community service for 300 hours.

14         THE COURT:  What is the government's response?

15         MR. OTLEWSKI:  We have no objection to striking that

16    condition in light of the --

17         THE COURT:  I agree that it is not necessary under the

18    circumstances in this case.  And as the Court said originally,

19    and as requoted, the defendant has done some public service

20    work and is very likely to do public service work of his own

21    volition.  That's something he would want to do.  So he is not

22    obligated to do 300 hours of public service work.

23         There is a condition, however, that I am obligated to

24    read that deals with community service in the event he is

25    unemployed for some period of time.  But what these cases say

1   is that the conditions must be read in open court, and that is

2   what the Court is obligated to do.

3          So with respect to the supplemental report provided by

4   the probation department, they contain the mandatory

5   conditions, discretionary conditions, and special conditions.

6   The defendant has waived his right to appear.  So the

7   conditions originally imposed will, once again, be imposed.

8   The Court sustains the position of the defendant --

9          MR. FLACHSBART:  Your Honor, I suspect neither the

10  government nor us would like the original conditions, but only

11  the supplemental -- the report's conditions due to the fact

12  that those conditions include, for example, the impermissible

13  condition with respect to being present where controlled

14  substances are, even unknowingly.

15         THE COURT:  These are the conditions I intend to

16  impose.  They are the ones submitted by the probation

17  department in their supplemental report submitted to the Court

18  on May 9th.  So I intend to impose them, and I intend to read

19  them into the record.

20         Now it is my understanding that you have agreed to

21  this.  Is this not correct?

22         MR. FLACHSBART:  Those conditions, yes, your Honor,

23  absolutely.

24         THE COURT:  The ones that are contained --

25         MR. FLACHSBART:  May 9th.

1      THE COURT:  -- in the May 9th supplemental report.

2      Is that the government's position?

3      MR. OTLEWSKI:  Yes, your Honor.

4      THE COURT:  Okay.  Do you have that report before you?

5      MR. OTLEWSKI:  I do, your Honor.

6      THE COURT:  All right.  And it is submitted by the

7  probation department, filed on May 9th.

8      But as these recent cases point out, the Court is

9  required to read them orally in open court.  And so mandatory

10  conditions of supervised release pursuant to 18 U.S.C. Section

11  3583(d).  Number one, not commit another federal, state or

12  local crime.

13      Number two, not unlawfully possess a controlled

14  substance.

15      Number five, cooperate in the collection of a DNA

16  sample if the collection of such sample is required by law.

17      Moving on to discretionary conditions.  Number two,

18  make restitution to a victim of the offense under 3556, but not

19  subject to the limitations of 3663(a) or 3663(a)(C)(1)(A).

20      Number four, seek and work conscientiously at lawful

21  employment or pursue conscientiously a course of study of

22  vocational training that will equip the defendant for

23  employment.

24      Number six, refrain from knowingly meeting or

25  communicating with any person whom the defendant knows to be

1    engaged or planning to be engaged in criminal activity.

2          Number seven, refrain from any use of narcotic drugs

3    or other controlled substances as defined under Section 102 of

4    the Controlled Substance Act, 21 U.S.C. Section 802, without a

5    prescription by a licensed medical practitioner.

6          Number eight, refrain from possessing a firearm,

7    destructive device or other dangerous weapon.

8          Twelve is the one that is not going to be imposed in

9    this case.

10          Fourteen, remain within the jurisdiction where the

11   defendant is being supervised unless granted permission to

12   leave by the Court or a probation officer.

13          Fifteen, report to a probation officer as directed by

14   the Court or probation officer.

15          Sixteen, permit a probation officer to visit the

16   defendant at any reasonable time at home, at work, at school.

17          Seventeen, notify a probation officer promptly within

18   72 hours of any change in residence, employer or workplace.

19   And absent constitutional or other legal privilege, answer

20   inquiries by a probation officer.

21          Eighteen, notify a probation officer promptly within

22   72 hours if arrested or questioned by a law enforcement

23   officer.

24          Twenty-two, satisfy such other special conditions as

25   recommended below.  And reading those recommended below as

1   special conditions under 3563(b)(22) and 3583(d), condition

2   number three, to which the Court alluded earlier, if unemployed

3   after the first 60 days of supervision or if unemployed for 60

4   days after termination or layoff from employment, perform at

5   least 20 hours of community services per week at the direction

6   of the U.S. Probation Office until gainfully employed.

7            Special condition number five, not incur new credit

8   charges or open additional lines of credit without the approval

9   of a probation officer, unless the defendant is in compliance

10  with the financial obligations imposed by this judgment.

11           Number six, provide a probation officer with access to

12  any requested financial information necessary to monitor

13  compliance with conditions of supervised release.

14           Number seven, notify the Court of any material changes

15  in the defendant's economic circumstances that might affect the

16  defendant's ability to pay restitution fines or special

17  assessments.

18           Number eight, provide documentation to the IRS and pay

19  taxes as required by law.

20           Condition number ten, pay any financial penalty that

21  is imposed and remains unpaid at the commencement of the term

22  of supervised release.  The defendant's monthly payment

23  scheduled shall be an amount that is at least 10 percent of the

24  defendant's net monthly income defined as income net of

25  reasonable expenses for basic necessities, such as food,

1  shelter, utilities, insurance, and employment-related expenses.

2          Number eleven, not enter into any agreement to act as

3  an informer or special agent of a law enforcement agency

4  without the permission of the Court.

5          Thirteen, notify as directed by the probation officer

6  third parties of risks that may be occasioned by the

7  defendant's criminal record or personal history or

8  characteristics, and shall permit the probation officer to make

9  such notifications and to confirm the defendant's compliance

10  with such notification requirements.

11          I have read the oral conditions of supervised release.

12  And that is in compliance with United States of America versus

13  Jamie Oroczo, O-r-o-c-z-o, hyphen, Sanchez, also known as Oscar

14  Oroczo, case decided February 26, 2016, by the Seventh Circuit

15  Court of Appeals.

16          And another case, United States versus Seals, decided

17  February 23, 2016, by the Seventh Circuit Court of Appeals.

18          So what remains is the restitution issue.  From the

19  probation department's standpoint, with respect to the issues

20  before the Court today, have I missed anything?

21          MR. RICE:  Judge, just on Condition 16, there is also

22  a section called -- or saying permit confiscation of any

23  contraband.  Did you want that part of 16 imposed?

24          THE COURT:  Let me get back to 16.

25          MR. RICE:  Sixteen under discretionary.

1      THE COURT:  The page that I have skips from 12 to 21.

2   I don't have a 16 in the submission.

3      MR. RICE:  I'm looking at our supplemental report,

4   page 3.

5      THE COURT:  Supplemental report page 3.  All right.

6   Just a minute.  Page 1, I have page 2, I have page 4.  Now I

7   have discovered page 3, which I think I read earlier, but let

8   me emphasize this.

9      So 16, once again -- I do recall reading this, but I

10  may have missed something.  All right.  Condition 16,

11  supplemental report, page 3, of May 9th, 2016.  Permit a

12  probation officer to visit the defendant at any reasonable time

13  at home, at work, at school, at a community service location,

14  other reasonable locations specified by a probation officer.

15      And so the one that you have just brought to my

16  attention is permit confiscation of any contraband observed in

17  plain view of the probation officer.  That too will be imposed.

18      MR. RICE:  Thank you.

19      THE COURT:  I have just read it.  It is so ordered.

20      MR. RICE:  Thank you, your Honor.

21      THE COURT:  Have I missed any others?

22      MR. RICE:  No, your Honor.

23      THE COURT:  Okay.  So the matter will be continued

24  then to deal with this issue of restitution.  What's the most

25  recent submission of the government regarding the restitution

1    issue?  Dated what date?

2              MR. OTLEWSKI:  It was dated -- Docket Number 281,

3    dated April 22nd, 2016, your Honor.

4              THE COURT:  That's the most recent?

5              MR. OTLEWSKI:  Yes.

6              THE COURT:  Do you intend to supplement that in any

7    way.

8              MR. OTLEWSKI:  We do, your Honor.  We plan to present

9    two sets of exhibits.  I have produced those to defense

10   counsel.  One set of exhibits includes the unredacted invoices

11   and bills from FTI, the consultant hired by -- the forensic

12   consulting firm hired by Citadel, as well as the unredacted

13   billing statements and invoices from Greenburg Traurig, the

14   outside firm, group of attorneys, hired by Citadel to conduct

15   the investigation.  Those have been provided to defense

16   counsel.  I'm going to provide a set to the probation officer

17   as well so that she can --

18             THE COURT:  When do you expect to make that filing?

19             MR. OTLEWSKI:  I was planning to do it today, your

20   Honor.

21             THE COURT:  All right.  Can you do it tomorrow?

22             MR. OTLEWSKI:  Yes.

23             THE COURT:  All right.  How much time would you need

24   to respond, counsel?

25             MR. FLACHSBART:  Probably about a week, your Honor.

```
 1          THE COURT:  Would that -- the date for the restitution
 2   is, did you say, June 8th or --
 3          MR. FLACHSBART:  June 7th.
 4          THE COURT:  All right.  What is the date,
 5   Mr. Fulbright?
 6          THE CLERK:  June 7 at 10:30.
 7          THE COURT:  June 7th.
 8          All right.  So try to get the defendant's submission
 9   in by June 6th, which would be a Monday.  The hearing remains
10   set for June 7th.
11          All right.  So I think I have resolved everything that
12   was before the Court today.  The restitution issue will be
13   argued on June 7th.  10:30, June 7th.
14          MR. FLACHSBART:  We have only one request, your Honor,
15   if we may.  I understand that it is not appealable until we
16   have dealt with the restitution, but if your Honor would not
17   mind entering an order with respect to the sentence and the
18   probation so that it can be conveyed to the BOP so they can do
19   the things that have to do, which are well beyond my
20   competency.
21          THE COURT:  That will be the job of Mr. Fulbright as
22   the clerk.
23      (Discussion off the record.)
24          THE COURT:  But the order, which results from the
25   rulings that the Court has made, in the first instance, it
```

1   should be submitted by the prosecution, the prevailing party

2   here.

3          So present an order for the Court to sign.  Show it to

4   opposing counsel.  And if there are objections to its substance

5   or form, we can deal with them.  But this is not the absolute,

6   final appealable judgment, it would simply be an order dealing

7   with the rulings I have made today.

8          Now with respect to the restitution figure, the

9   government's basic position is $750,000.  If the defendant can

10  reach an agreement on some -- with the government, if you can

11  reach an agreement that is reasonable, you could submit an

12  agreed order.  And if the Court agrees with the reasonableness

13  of it, the Court could be in a position to sign it.

14         On the other hand, the defendant does have the right

15  to be present and to argue against the government's position

16  which is as of today $750,000.

17         But, once again, I'll leave this in your capable

18  hands, and the Court will be ready to proceed on June 7th at

19  10:30.

20         MR. FLACHSBART:  Thank you, your Honor.

21         MR. OTLEWSKI:  Thank you, your Honor.

22

23

24

25

1       CERTIFICATE

2           I certify that the foregoing is a correct transcript

3   from the digital recording of proceedings in the above-entitled

4   matter to the best of my ability, given the limitation of using

5   a digital-recording system.

6   */s/Pamela S. Warren*                    November 29, 2016
    Official Court Reporter                      Date
7   United States District Court
    Northern District of Illinois
8   Eastern Division

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25